Southard J.
expressed the opinion of the court, and declared the evidence admissible. To this opinion the counsel of the plaintiff prayed a bill of exceptions, and it was ordered.
From the course which the cause subsequently took, the reporter does not think it necessary to give, the substance either of the argument of the counsel or of the remarks of the court.
Evidence for the defendant.
It was admitted by the parties, that John Vancleve, the brother of the defendant, died in the month of July, in the year 1802.
Edmund Roberts. A little before John’s death, witness had a conversation with testator about learning. He was then a member of the legislature, and long before and after, a man of high standing in society. He had given a part of his farm to John, and told witness that he had given John an education, which would be more valuable to him than so much fast property; and he intended to *701 give Joseph the farm on which ho lived ; that if he gave John nothing more, he should have done as well by as if he gave him more land. He said nothing of his daughters. The last time witness called to see him, or had any conversation with him, was about two years before his death. It was in the last summer of the last war. He wras then an altered man. When witness came up to him, on his porch, he did not seem to know witness, but said, you have the advantage of me. Witness said he thought it was strange he did not know him. He said he thought he knew witness’ voice. Witness told his name. He then said it was strange he did not know him ; and asked him to walk in. They sat and conversed in the passage about an hour. He spoke of what had happened in the revolutionary war, and in *the legislature, and appeared to have his memory perfectly, about ancient matters; and whenever any thing was presented to his mind, he understood it fully. His judgment was very bright and accurate. He told his daughter to bring something to drink; asked witness to drink, and to call and see him again; and seemed desirous to be familiar, and to keep up acquaintance.
Ralph Lanning. Sixty years old in March, lived within a mile of testator, and knew him for twenty years, last past. In June or July, seven years ago, was passing along the road, and testator, who was sitting on his porch, called witness to him. In the conversation, he asked witness what he was going to do with all his land. Witness replied that he had heirs and heiresses enough. He then told witness that he had better do as he was going to do. Witness asked, how is that? He replied,give it all to my son Joseph. Witness asked why? He said Dr. Clarke hud plenty of land, and so had Maj. Stevens; that Joseph should take the land, and pay his two sisters; and that witness had better not break his farm, but give it all to one of his sons. After this they conversed about farming, and such matters as are common for neighbours to talk about.
Rev. Isaac V. Brown, again. During one of witness’ parochial visits to testator’s, between 1810 and 1813, testator said that he would give, or had given, his farm to Joseph, so that he should have it after he was done with *702 it. Witness did not recollect wliat led to the conversation ; but, as he did not wish to enter into such subjects in his conversations, he disposed of it as soon as he could. Witness did not recollect that any thing was said of the daughters. Witness was well acquainted with the character of Phares and his wife. Phares was a man of considerable intelligence, good principles, correct deportment, a professor of religion; in bad health the latter part of his life, and passed through trying circumstances, being reduced ; but witness never heard his reputation assailed by any body. For several weeks before his death, he was very sick and low, and in witness’ last visit, three or four days before he died, was,' or appeared to be, fully impressed with the belief that he was about to die. Mrs. Phares had been respectable, both as a young, and as a married woman. Witness considered her a pious woman, and exemplary Christian. Mrs. Ruth Stevens has a good and correct general character; and * Thomas Stevens was considered upright, respectably, and of veracity.
Henry Coolc, was sixty years old; had known testator forty years, when he commanded a company at the battle of Long-Island. Witness’ farm adjoined the premises. About the year 1810, testator came over to visit witness. He said that Joseph had bought John’s part of the land, which -was about 100 acres, given him by testator, lying over the road, and got it pretty well under way for paying for it. He was pleased with it, as the place would be all together again. Witness asked testator, if he had given the rest of the place to Joseph? He said no; he meant to keep it as long as he lived, and then Joseph might have it. He did not mention his daughters. The rest of the' conversation was about indifferent matters.
It being proved that Charity Smith was sick, and incapable of attending, her deposition which had been taken by Justice Southard, under the statute, was read. It stated that she was grand-mother of defendant’s wife; eighty-one years old, two days before her deposition was taken; had for thirty years been a near neighbour of, and intimately acquainted with, testator,' and, for one or two years, lived in the house with him; and herself and husband were very much attached to him, and he to them. *703 She went to his house every day, for some time before his death, because, when she came in, fie used to take her by the hand, and hold and press it, tell her he was g'lad to see her, and wished her to come often. He always knew her when she came in. She was a witness to a will made by testator in 1809 ; and he afterwards informed her, that he made another will, in 1814, because he had had a property, in right of his wife, in Monmouth, which he had sold ; and he heard that Stevens said, after he was dead, he meant to get that property; which testator supposed he would bo able to do ; and, as he had given a legacy to Stevens’ wife, in his first will, he wished so to alter it, that, if Stevens did get back that property, his wife should not have the legacy. He further stated to deponent, that Dr. Clarke was the richest man in the neighbourhood, and able to support testator’s daughter, without his giving him any thing; that Stevens had no child, and had property enough, if ho took care of it, and it was needless to give him more; that he had advanced to his daughter, Mrs. Clarke, to the amount of eight hundred dollars, and had left her two hundred *more in his will, making $1000, and that was as much as he thought any common farmer gave his daughters; that he had not given quite as much to Mrs. Stevens, because she had no child, and if he gave more Stevens would not take care of it, but would work through with it; but he had left her the same as Mrs. Clarke, in the will; that his daughters were both well fixed; and he intended his son should have his farm. Deponent did not recollect that the testator told her what he left to his daughters in the will of 1809, to which she was a witness, but believed it was the same with the last, except the alteration before mentioned. He often told deponent, that he did not like Stevens; that Stevens did not treat him with respect; that he was often at Stevens’ house when they were eating, and he would ask him, if he had eaten ? in such a way as to give him offence, and he would not eat with him; that he was angry with Stevens, for parting with his farm. Deponent heard testator tell his son Joseph, that he must take care of Dr. Clarke, and not put himself in his power; that he was very rich, and a cunning artful man, and he would *704 take the advantage of him, if he could. Deponent had a. perfect recollection of a conversation which took place between her, defendant, his wife and Mrs. Clarke, on the 28th of August, last, a part of it in the entry, while the door of testator’s room was open, and part of it in his room. Defendant said to Mrs. Clarke, my father’s will is gone, and some of you have taken it away. She replied; she could take her oath Mrs. Stevens had not taken it. Defendant said; you know who has got it. She replied ; she herself had not got it. Defendant said ; some of you have it, and you know who it is. She replied; she did not care; it was no more than he would have done, if he had had the same chance. She added; that she knew her father had given Joseph the land, in all the wills, and intended him-to have it, and they did not want his land. Defendant then said; what is it then Betsey, that you do want? Deponent did not recollect the answer. Mrs. Clark was in a violent passion, shook her fist at deponent, and raved and abused defendant, his wife, and deponent, very much. She told deponent that Joseph said she, deponent, was a drunkard. Deponent supposed she intended to make her angry with Joseph and set her against him, and replied to her; when you strike at any one and don’t hit, the blow don’t hurt; that she did not care who called her a drunkard, it was not true, and a good conscience was better than a thousand ^witnesses. Mrs. Clarke also told her to tell her grand-daughter, Chatty, to hold her tongue, and not say so much, as she would repent it. She also told defendant and his wife, that they did not treat her father well, but abused him, and deponent knew it, and that they had also abused deponent, while she lived with them. Deponent knew that this was not true, both as to testator and herself, and told Mrs. Clarke that she was much surprised at her conduct, and at what she said. Mrs. Clarke came there only a short time before the conversation, and went away very soon after it. When she went into the room, testator did not speak to her, but seemed very much affected. He laid near the door, so that he could hear what was said in the entry as well as that in the room ; he seemed very much hurt, the tears rolled down from his eyes, and he groaned *705 worse than deponent heard him, in all his sickness. lie could talk on that day, and did converse with deponent, after Mrs. Clarke went away, about indifferent matters, but deponent did not mention what had passed, as she perceived it hurt him. What he said, on that day, was rational, and he had full possession of his reason and memory. Deponent thinks she saw him, on the day the will was executed, as she was there every day, and, on that day, he was of sound mind and memory. They had, at times, before this failed occasionally, but in the main he had them very well; could understand what was said to him and answer questions put by any body that came in, so that they could understand him, but he did not converse much with any one. She did not recollect any conversation with him, on the day the will was executed, nor any particular conversation in his last illness, except his inquiries about the health of different neighbours, and the dispute then existing between Mr. Reeder and Mr. Phans, about a line of their lands. He often talked about that dispute, recollected the line, and where the old road run, and all the circumstances about the dispute. It arose after he was confined by his last sickness.
Frazee Ayers, esqr. In consequence of his marriage with the sister of defendant’s wife, he had been acquainted, and visited in the family of the testator, since 1804. In the year 1809, walking from Mr. Smith’s with testator, he told ■witness that he had given his son John the part of his farm on the east side of the road, with twenty acres of wood, on the other side; that since the death of John, defendant had purchased it and he was pleas*ed with it, as defendant would now have the whole farm together; that he had made his will and left the rest to him, and given a legacy to each of his daughters, of a small sum, witness thought about three or four hundred- dollars. Witness thought the sum so small for his large property, that he turned and looked at him. He then said that his daughters were very well married, and would not want any more ; that Joseph had been all the time with him, on his farm, and he intended to give it to him; that he had been obliged to make up a considerable sum of money for a sheriff, for whom he was security, and who had been in default; *706 and that Joseph had helped him to pay the money. He did not say that he helped him to pay it, off the farm.
Jasper Smith. Was about the same age as testator, and always lived near him, as an intimate neighbour and friend. About seven years ago, witness sold a piece of land to Mr. Panning, and testator took him to task about it, and said he did not mean to break his farm; that he had made, or intended to make, his will, giving it to Joseph, who should pay out something to his sisters. Witness was at testator’s, some time before his death, when Mr. Brown talked to, and prayed with, him; he seemed still and very near his end; witness did not recollect that he heard him speak. Some years before that time, he lost his recollection very much, but his judgment was quite good some time after his memory began to fail. When you first entered into conversation with him, he seemed quite forgetful, but after some conversation, he talked rationally and understood every thing. About two years before he had the palsy, he went on horseback with witness and defendant, to view a line which was in dispute between his farm and Mr. Reeder. He pointed out where the line was, along the brook, said they had encroached and cut two trees, for which he would make them pay, but he was an old man, and did not choose to trouble himself with it; that they were neighbours, and Joseph might do as he chose.
Robert Phares, major, brother of John Phares. Present, part of the time, when his deposition was taken; he was cautioned by the judge to tell the truth; he seemed to consider himself a dying man; was very weak, but seemed to have a clear, good recollection. Much delicacy was exhibited towards him in the’examination.
Samuel L. Southard, took the deposition of John Phares ; he *was weak, and could with difficulty relate what he had to say. Very few questions were put to him; but he detailed the answers as they were taken down. The deposition is nearly, or quite, in his own words; perhaps, more nearly so, than any deposition witness ever took.
Samuel Hunt, son- of Nathaniel Hunt, who was an old and intimate friend of testator. Witness was thirty-eight years old, and acquainted with testator from his youth, *707 and lived within three miles of him. Between 1810 and 1813, ho informed witness that when he was done with the property where he lived, he intended to leave it to Joseph. At that time his memory and judgment were good. Witness saw very little of him, from 1809, to February 1817; when witness visited at the house with his wife. Then thought his memory rather impaired and not so steady as formerly. It seemed more impaired than ■was usual in old people; but witness did not speak much with him, or take any pains to ascertain the state of his mind, but rather avoided conversation with him. Witness’ father, testator, and two others, wrero sureties for John Anderson, sheriff of Hunterdon. They had to pay, each, about $800; after which, they recovered $500 between them, and out of this $500, they paid away about $400. That business was settled about 1811. Witness, about 1810, heard defendant say, that his sisters were to have £200.
Mrs. M. Phares, again. When Mrs. Clarke, and witness, were standing by the dead body of testator, on the Sabbath after his death, she asked witness if she thought he had his senses that day week ? Witness replied, that she did. Mrs. Clarke then said, she had not seen any thing like it during his illness. Witness often heard John Phares speak of the making of the will, both in public and in private, and he always held the same language about it, till the hour of his death. He always declared that the testator was capable of making a will; that he was forgetful, but his judgment was good ; that he, Phares, was satisfied with what he had done, and would do the same, if -it were to do over again. Witness never saw any thing harsh or unfeeling in defendant, or his wife, towards testator. They always behaved with prudence and propriety, towards him; and witness heard Mrs. Stevens say, in her father’s last illness, that Mrs. Vancleve had treated him in the most exemplary manner.
John Potts. Some time last winter John Stevens called on ^witness, and told him he ought to allow something for the claim, in right of his wife, on the Monmouth lands. That he would be reasonable, and did not expect to demand the full value. Witness replied that he had not *708 expected any demand for it. Some time after, witness on him, and told him he understood they were serious in the demand. Stevens replied, that he could not get any thing of Joe, was the reason. Joe would not allow them any thing. A. few days before Monmouth court, at which the suits brought by Clarke and wife and Stevens and wife, for the Monmouth lands, were to have been tried, witness met him in Mr. Wall’s office, and some conversation occurred about the wills which were missing ; and witness said something to him about their being stolen. He said it was not likely that a man could be seen at a distance, through a window, doing a thing like that. Witness was willing to give 500 dollars for their claim, rather than go to law about the lands. They were bought of testator about twenty years before, for ¿£300. There was seventy acres; and the tract had since been sold for 41 dollars, 10 cents, per acre. When they were bought by witness’ brother, witness told him there would probably be some difficulty, as they belonged to testator’s wife ; but testator replied that his son John would join him in a warrantee deed, and he would make such arrañgements that there would be no difficulty. After witness heard that Dr. Clarke meant to make a demand for the land, he went up to see testator. It was after he was struck with the palsy. He lay in bed, and appeared to know witness, but did not speak, or attempt to speak. As witness stood by the bed, he looked earnestly at witness, took his hand, and laid it on his face. Witness thought he was not capable of business, and left him.
Stephen Johnson, again. Did not recollect that he ever said that the will was made by the son, and not by the testator ; nor that he was in his dotage. He did believe that he was in his reason on the day the will was signed, and did make the will; and that the son did not make it. Witnesss did not recollect that he ever said any thing to any one, about it, until Gen. Wilson came into the house, one day, and asked him about it. He had then been at work there, some days. He did not recollect mentioning it, particularly, to Redway and Doan. Witness sometimes works at farming, when he cannot get work to do at his trade.
*709 Henry Vandeve. About two weeks ago, Mrs. Stevens to-ld *witness ¡but her father had, eighteen months before, informed her that he had no will. Witness sat up with testator about two weeks before his death. The person who sat with him, administered to him; and, witness believed, without consulting him. He lay still, and did not speak, nor did others speak to him, as witness heard. Witness saw him about a year before his last sickness; his memory had then failed very much, and he did not know witness; but, when his name was mentioned, he recollected witness well, his name, father, and former acquaintance; and made many inquiries about witness’ father and family.
Capt. Amos Hutchinson. Knew John Phares well. He was a man of excellent character, for morality and truth.
Jasper Smith, again. Was a near neighbour of John Phares, for seven or eight years, and never heard the purity of his character, as a man of morality and truth, questioned.
Joseph Scudder, esq. At Forman’s tavern, in the township of Trenton, a little before May court last, there was a trial, in which witness was concerned, as overseer of the poor; and Maj. Stevens was called as a witness. At that time, witness and Map Stevens, had a conversation about the charge which had been made, of stealing the wills. It commenced by Stevens asking witness what kind of a girl Abigail Coulter veas, who had formerly been bound to witness, and afterwards to defendant. He said that one of those girls was not smart; that something had been laid to his charge, about taking the will; that there was nobody, who had any chance of seeing any thing, but the bound girl, Abigail Coulter, and Joseph Vancleve’s daughter and sister’s; but that he had not seen the will, more than he then saw it, in his hand ; holding his hand out, and looking at it.
Mary Vandeve, daughter of the defendant, between fourteen and fifteen years old. Heard Mrs. Clarice repeatedly say, that defendant and his • wife must have a great deal of trouble with testator, and never heard any intimation of neglect or ill treatment, from any one, until after the wills were missing. During testator’s sickness, *710 Mrs. Stevens frequently came to the house, and sometimes staid three or four days. The first part of the time she brought her clothes in a band-box, the latter part, in a small trunk, which she always took with her when she went away. When she brought the trunk, she had with her, in her work-bag, a bunch of four or five keys, on a ring about the size of a *dollar, with a spring-catch to it; which witness believed belonged to Dr. Clarke, because, in the month pf March preceding, during one of the visits, of about a week, which she made to her aunt Clarke, she had seen precisely such a one in the doctor’s book-case; took it down and examined it, and gave it to his little girl to play with; and though she had visited often at her aunt Stevens’ and seen her keys, she had never seen such .a ring there, nor any where else. This ring she saw in Mrs. Stevens’ work-bag, in the latter part of the month of June, when she had been sent, by her, to get something for her outof the bag. Dr. Clarke'was testator’s physician, and, in the first part of his illness, came there frequently, as often as twice a week, but in the latter part not so often. Witness heard him say he had not been there in five weeks before the will was missed. He gave no reason for not coming, nor did witness know any. Dr. Clarke was generally, but not always, there, when Mrs. Stevens was, but when they did meet there, they almost always went into the parlour, and had a private conversation. Witness saw them leave testator’s room, and go into the parlour together, as many as three or four times. Defendant’s wife, wished Mrs. Stevens, to stay with her father on the third of August, being the third Sunday before the will was executed, so that defendant and wife might attend church. Mrs. Stevens agreed to stay with him on that day, and came there on Saturday evening. The morning being bad, defendant declined going to church, but Mrs. Stevens urged him, and he and his wife went at the usual hour, which was about half past ten o’clock. Witness and her sister, who is about twelve years old, a bound girl, a black woman and Mrs. Stevens were left at home. A little black boy was also there, but not in the house. Soon after defendant was gone Mrs. Stevens gave testator two tea-spoonfulls of paregoric, which was double *711 the dose >,\] deh the family frequently gave him to make him easy. She then shut the door of his room and' up stairs, into the room over him, where there was a bed? anda Joskin which defendant usually kept his papers locked up. As Mrs. Stevens came into that room, witness came out of it and left the door open, nor did witness know whether Mrs. Stevens shut it. It had no lock and was directly opposite to the landing, at the head of the stairs. Mr.?. Stevens, when she lodged in the house, slept in several rooms, but never in that one. She staid in that room until Maj. btevens came to the house, *whieh was about an hour before defendant and wife returned home. It was raining when he came, and he drove his chair into the chair-house. He usually had his horse taken out, but lie declined it on that day, both before and after defendant returned. When he came up, the black boy was standing at the door, and he asked where his master was ? The boy told him he was at church. He then asked where the children were ? and was informed. Mrs. Stevens came down stairs to meet him, and told witness to go with her sisters into the kitchen and help the black woman shell peas, which witness did, and remained there until her father and mother returned from church. The black woman had the charge of getting dinner, and Mrs. Stevens never before gave witness such a direction. Maj. Stevens and his wife staid to dinner, and immediately after, as soon as the rain cleared up, went away. Maj. Stevens said he had been at Dr. Clarke’s the night before and came from there. The conduct of Mrs. Stevens, on this day, did not, at the time, strike witness as singular, of induce her to suspect any thing, nor did defendant inquire about it, nor did witness mention it, until about a fortnight after defendant complained that the wills were lost. When defendant did inquire she told him about it, but did not then, or at any time, tell him nor any one else, that she saw Maj. Stevens or Mrs. Stevens, at the desk. Late in the fall, previous to testator’s death, defendant and witness were in the room, over where testator lay in his last illness, and where the desk was, in which defendant kept his papers. Defendant had the desk opon, and Abigail Coulter came up and informed *712 him, that some person wanted to see him. He went down, 'then Abigail, Coulter asked witness to look in the desk for her indentures, and see how old she was, and when she would be out of her time. Witness did look, and upon opening one of the drawers, saw two papers folded up and sealed, and endorsed, as she believed, in testator’s hand-writing. The upper one was marked, “ Benjamin Vancleve’s will of 1814.” The under one, “Benjamin Vancleve’s will of 1809.” Abigail Coulter could not read writing, and asked witness what they were ? Witness informed her, they were grand-pa’s wills; and hearing defendant coming up the stairs, they left the desk.
Mrs. Stevens came to defendant’s the day before the will was executed, and staid all night. In the morning, defendant discovered that the wills were missing out of his desk, and sent witness’ sister down stairs to call Mrs. Stevens up to him. He also directed witness to go down; and, as she was going down the stairs, she heard 'her sister ask Mrs. Stevens to go up to defendant, and Mrs. Stevens replied that she would, presently; that she was reading to her father, the testator, in the Bible. When she went up, defendant charged her with taking the wills. Soon after this, Mrs. Stevens asked witness if she liad ever seen her at defendant’s desk, and witness told her no; for witness never had seen either'her, or Maj. Stevens, at it. Soon after this conversation, Maj. Stevens drove up, and Mrs. Stevens went out into the yard to him ; and when they came in, Maj. Stevens said to defendant, “ it was a will of your own making, and it is foolish to charge us with it, for you can’t prove it.” They were angry at being charged with taking the wills, and left the house about eight or nine o’clock; which was one or two hours before Mrs. Phares came, arid the will was executed. Stephen Johnson had come to the house before breakfast, and was there at that time. Mrs. Phares called on her way to church, and was asked in by defendant’s wife. Mr. Phares was sent for by defendant. Defendant read the will over to testator, and asked him if he could understand it? he said yes. Defendant asked if it was not a true copy of his last will? he said yes. . Defendant told him to speak *713 loud so the witness could hear him; he raised his voice, and said yes, yes, I say so. Defendant asked him if wished it executed ? he said, I do. Mr. Phares asked him if he should guide his hand when he wrote his name ? he said yes. Mr. Phares, or defendant, witness did not recollect which, said it would be necessary for him to acknowledge it. He then put his finger on the seal, and said, I acknowledge this to be my last will and testament. He then took Mr. Phares by the hand and shook it, and seemed to be very much exhausted. Witness could not say whether it was hard for strangers to understand him, when he spoke ; but, being well acquainted with him, she understood him perfectly; and did so at the time the will was executed. During all his last sickness, until the Friday before his death, he was capable of speaking, of asking, and answering questions; and often talked to Mrs. Clarke, and asked her why the Doctor did not come to see him. He had the possession of his understanding after the attack, and when the will was executed, as he had before. On Monday, the day after the execution, Mrs. Clarke *eame, and, in conversation with defendant, said, let who would have taken the wills, she would take her oath, her sister Phebe never took them. She also asked witness what the testator said the day before? and witness replied, he said enough. The next day, Maj. Stevens and wife, came to the house, and went in to see testator. Mrs. Stevens took hold of his hand, three several times, and he drew it away, each time, and laid it on his breast, and groaned very hard. Witness never heard such groans. The next day, but one, Mrs. Clarke came again. Mrs. Charity Smith was there, and high words passed between her, Mrs. Clarke, and defendant’s wife. Defendant told Mrs. Clarke that she took the will; she replied, I don’t care if I did, it was no more than you would have done, if you had had the same chance. Defendant told her she knew that testator had given him his land, in all the wills. She replied, I know it, and we want none of your land. He asked; “ then Betsey, what do you want ?” To this she made no answer.
In 1814, witness saw testator write a will, and after it was done, her little sister asked him, what he would give *714 her ? He told her he would give her something; that he - had given her pa the farm, and he expected, after her pa’s death, that her little brother, Benjamin, would have it. Witness told Mrs. Clarke and Mrs. Stevens that testator had made a will, soon after it was done, in 1814.
After Mr. Potts had been to see testator, witness heard defendant tell Mrs. Stevens that Potts had been there about the Monmoyih property, and that testator had expressed a wish, in his will, that none of his children should call on the Pottses about it. She said that testator had always told Mr- Stevens that he intended that property for his children.
Abigail Coulter, between sixteen and seventeen years of age, was offered as a witness, whereupon the counsel for the plaintiff requested that she be first interrogated whether she had ever been sworn in court, and understood the nature and obligations of an oath ? The court declined interrogating her, and she was sworn.
In the fall before testator died, she asked Mary Vancleve to read her indentures to her. In looking for them, Mary opened a drawer and took up two large papers, which witness supposed to be letters, and asked what they were. Mary said they were her grand-pa’s wills. A few Sundays before testator died, and *when Mrs. Stevens was at defendant’s, Maj. Stevens came ; it was raining, and he drove his chair into the chair-house. Witness was standing at the end of the house, where he did not see her, and as he came near the door, he asked a little black boy, belonging to defendant, where his master and mistress was ? The boy said ; gone to meeting. He asked; where are the children? The boy said ; they are at home. He then went into the house, and was there until after dinner. Mary was part of the time, before her father and mother returned, in the kitchen, shelling peas. On a Sunday some time after this, witness heard defendant and Maj. Stevens talking about the wills, and Maj. Stevens said; “ it is foolish to accuse us of taking the wills, for you cannot prove it.” Witness never saw Maj. Stevens in the room where the wills were, nor ever told any body that she did see him there. She never saw any body take the wills.
Mrs. Rachel Coulter, the mother of Abigail, met Mrs. *715 Stevens in the street, the latter part of last August, and she asked witness home with her. In the conversation Mrs. Stevens’ house, she told witness she wanted her to bring Abigail to see her, and if she could not come, then witness should talk to her, and see if she knew any thing about the wills; that they had taken her to Flemington, as a witness; and Mrs. Stevens asked witness if she thought a person, at the lower end of the garden, could see any one take a will out of the desk, in an upper room. Nobody was present at this conversation, but a black woman, whom. Mrs. Stevens called in, to tell witness, how Joseph Vancieve treated her children. After this, Mrs. Stevens left a message with Mrs. Brown, for witness to call on her; witness did call, but she was not at home. Witness had a little girl at Mr. Jones’ which she had, some time before, wished to put somewhere else, and on the Friday preceding the trial, about eight o’clock, at night, Maj. Stevens called oil her at Mr. Moore’s, who lives seven or eight miles from Trenton, and told her he would buy the child’s time. Witness did not know what they intended to prove by Abigail, until Mrs. Stevens told her ; nor did she leave word, at Mrs. Brown’s, that she wanted to see Mrs. Stevens, to get her to take her little girl; nor had she any conversation, at Mrs. Brown’s, with Mrs. Stevens, respecting Abigail’s testimony.
Here the defendant rested, and the plaintiff called
* William Hamilton. Who testified, that he had known testator since 1788 ; but not much of late years. Witness lived at this end of Middlesex, until last April, a year ago, when he moved to Lawrenceville. Before testator was taken down, lie came over to Middlesex, to get some work done, and seemed very smart. The May before he died, witness called at the house, on Sunday morning, between eight and nine o’clock ; and being in the room with defendant, they heard a shuffling in the entry, and defendant said that testator had been quite unwell, but had got better; that his recollection was feeble, and his memory had, seemingly, left him. Testator came in with a small cane, and defendant asked him if he knew witness. He looked round, and up to the ceiling, and said he did not Defendant then told him, that witness was John Hamilton’s *716 son. He recollected witness’ father, and asked where witness lived. Witness told him, on the lot, next the church, and his recollection then seemed to come to him, and he mentioned who had lived on that lot for a number of years past. On the Sunday after testator’s burial, witness was sitting with defendant and his wife, in their entry, and defendant said, that his father’s wills, of 1809 and 1814, had been stolen. That they were together, in a drawer or pigeon hole, in his desk; and that a will of 1775, lay on one side of them, and a copy of the will of 1814, drawn by Charles Ewing,.on the other; but these were left. When he missed the wills, he sent his eldest daughter to call his sister, Mrs. Stevens, up to him, and when she came he was standing by the desk, and her countenance seemed as if she knew what she was sent for.; she looked guilty and condemned, and took her seat on the bed. He then said to her; what devilish •thing, Phebe, is this you have been doing, you have been taking my father’s wills out of the desk ? She denied it. He continued to charge her with it, and she burst out crying and went down stairs, and meeting Mary, asked her if she saw her at her father’s desk when he went to meeting ? and Mary answered; no aunt, I did not see you at the desk. Witness then said; if you are so sure she took it, if Mary had answered her yes, you would have brought her to confession, and found it all out. Defendant replied; that would have been a lie, and he did not wish her to tell a lie about it. That there was nobody about but the children, and they were playing about, and knew nothing of it, and had no mistrust. His wife had told him that Mrs. Ste*vens had a bunch of keys, and she suspected something wrong, and was afraid she meant to take her father’s wills. He replied ; my God, you do not suppose people would steal; but he now thought if he had taken his wife’s advice, he would still have had the wills.
Mrs. Hannah Davison. In the fall after testator’s death, John Phares, was at her house and had a conversation with John Davison, her husband, which she heard, but to which she was not particularly attentive. Davison asked him, if testator was sensible what he was doing, when he made the will ? He replied; I hardly know. Davison *717 asked; could he spoak? Phares replied; not distinctly. Could he write his name? I guided his hand. Are you not sorry for what you have done? No. It amounts to nothing, aud I did it to pacify the family.
John Davison. At witness’ house, in the fall after testator died, had a conversation with John Phares. Witness asked him, if testator -was capable of making a will ? He answered, by no means whatever. Witness asked; could he speak ? He replied, that he appeared to revive and make a noise, so that they thought they could understand him. Could he sign his name ? Pie could not: he Phares, took his hand, guided the pen, and wrote his name. Witness asked him, if he thought he did right ? He answered, that he thought it of no effect, one way or the other, and he did it to oblige the family. Witness was, at that time, in business with Maj. Stevens, and felt considerable interest in this matter, and talked a good deal, and expressed his opinion, about it. Phares was then at work at his trade, for the firm of Davison and Stevens, and knew' witness’ opinion.
Gideon Smith. Lived, for fifteen years, within a mile and a quarter; had been acquainted with testator as long as he could remember, and worked for defendant more or less every summer, for two or three years before testator’s death. Helped defendant mow and cut his oats, in the July before testator died, and, at that time, ate writh the family, but slept at home. Witness very often, almost every time he was in the house, saw testator, and once spoke to him, but never heard him speak or attempt to do it, nor take any notice of witness. He lay like a child, altogether incapable of business. Witness helped defendant and his wife, twice to move him out of his bed and change the bed and clothes; and once defendant asked him if he knew witness ? *but he neither looked up nor made any answer; he groaned and lay as if there was just life in him. Witness was frequently there, the twro years preceding his death, and he often asked witness’ name, and w'ho his father was, sometimes more than once in an hour; but when told, he knew witness. Defendant had the w'hole care and management of the farm, and hired and paid for the work, and when testator would some *718 times come out to the field and give directions about the - work, defendant would tell us not to mind him, he was childish. Sometimes, defendant would snap him up and speak short to him, and then he would turn away and say no more, for some time.
Thomas Ivins. Between November and January, last, saw defendant, at Burke’s tavern, where many persons were in and out, and heard him talk to Mr. Burke and others, about the loss of the wills. He told a long story about it, which witness could not well recollect, but he remembered that he said he was certain, in his own mind, that his sister, Mrs. Stevens, took it; that she had a large bunch of keys there, which, he thought, ought to have been at home,'where her husband was. He did not then accuse any other person.
Mrs. Catharine Ivins, formerly CatharineM’ Galliard, had, at different times, lived six or seven years with Mrs. Stevens, and lived there when married, two years and a half ago; had known testator eleven or twelve years. The first part of that time he came every week, and, sometimes, two or three times in a week, to see his daughter, and seemed fond of her and her husband. He was treated, by them, with affection, and always invited to stay and eat, and sleep. Within four or five years of his death, his faculties failed, he was very weak, and Mrs. Stevens often went within sight of his house with him, lest he should fall down and not be able to get up. At this time he forgot witness, and always asked his daughter, what young woman she had there. Witness lived two years with Mrs. Clarke, after her marriage, which was ten or eleven years ago, and testator often came there, and they appeared fond of each other. He said Phebe married early, but Betsey staid so long with him that he felt quite lost without her, it was not now, at his house, as it used to be; he missed her, but she was well married, had a kind husband, and he was satisfied; that he was pleased with the husbands of both his daughters. He was often pressed to stay all night, but *as he had a home he would stick to it, he liked his own bed best. Witness considered him an affectionate father and them affectionate daughters; he was never treated by them but with affection and respect.
*719 Miss Ann Brearley. Dr. Clarke was testator’s physician, but in July and August, 1817, before testator’s death, was confined from four to six weeks, to his house, and / principally to his room, by the kick of a horse. Witness had resided in Dr. Clarke’s family since April, 1817, and had access to the book-case, and to every part of the house, and never saw there a ring, for keys, with a spring-catch. There are two small keys and one large one, fastened together by a string, for the book-case.
Daniel Cook, esq. Was brought up within one and two miles of testator, and knew him well, twenty-five or thirty years. In April, 1815, witness was assessor of the direct tax, and called at testator’s. He asked witness who he was, and his father, and where he lived ? and seemed to forget witness’ father. He asked witness what his business was ? and when witness told him, he said Joseph must be sent for, as he did not or could not do any business. Joseph was sent for and the property given in, but whether testator or Joseph signed it, witness could not recollect. In the November following, witness called to invite to Daniel Banning’s funeral. Testator came to the door, and inquired who Lanning was, and who his father was, and where he lived ? Banning was brought up within two and three miles of testator, and testator was intimately acquainted with his family. Witness observed, on his return home, that his memory was gone, and he had become childish. At this time, testator walked to the gate with witness, and informed witness that Charles Moore, who lived about a half or three quarters of a mile off, had offered his farm for sale for $50 per acre, which testator said, was very cheap, and advised witness to buy it. Witness did soon after buy it, for another person, at public vendue, at 50 dollars, 25 cents, per acre.
Laban Dickinson. About two years before the trial, taught school in the neighbourhood, and boarded with his employers; saw defendant once, at the house of John Phares, and was asked to visit him. Defendant said that his father was, once, very capable of business, but had now become a child, and forgetful, and did not know, but often asked the names of his children and *grand-children, who lived in the house with him. In the June before *720 testator died, witness went with Phares to see defendant. They saw testator at the door, for a couple of minutes, and defendant told him who they were; after which, testator went into one room, and they into another, and they saw no more of him,
Mrs. Phares, again. When testator signed the will, he had his spectacles on, but witness did not recollect who put them on.
Mrs. Sarah Reeder, wife of Andrew Reeder. Had long been well acquainted with Charity Smith, and very intimate with her for five or six years past/ She is upwards of eighty years old, and rather remarkable for her superiority of intellect, for her time of life. She always stood high as a woman of sense and truth, and witness never heard her truth called in question. Within a year past, her health had declined a little, and her mind was not quite so active, but she was still smart for her age. Within four days after the death of testator, she told witness that the two former wills were stolen, and they had made a third will, within a few days before his death, but she did not think it would avail them any thing. She also said, that somewhere about a week before his death, an old Dutchman, by the name of Carson, who had lived with him eight years, and been absent about one year, returned, and went into his room, but could not, in any way, make testator sensible who he was, and was much grieved at it. She also said, that testator, before his death wished to be raised up, but Mrs. Vandeve told him that he could not: and that he could not be sensible of his situation, or he would not wish to be raised up.
Stephen Johnson. Did not recollect whether he had his spectacles on, but thought he was raised up, when he came in the room, and had pillows behind him.
Waters Smith. Was eighty years old. Something older than testator ; married his sister; and was a near friend and neighbour; and testator visited witness often, in his well days ; but witness did not recollect when he ceased to visit. Testator told witness that he furnished half the money to pay for the lands that Joseph bought of the heirs of John. Testator formerly used tobacco immoderately, and chewed considerable the latter part of his *721 time. Testator walked very weak, and shuffled along before he was taken down. After he was taken down, witness visited him three or four times, and spoke to him; but whether *he spoke 'to witness, witness could not tell, though he did not think he did; but he seemed, by the motion of his eyes, as if he knew witness. Witness was hard of hearing, but thought his own memory tolerably good. John Stevens is the son of witness’ only sister.
Charles Brown. Mrs. Stevens told witness’ wife, to let her know when Mrs. Coulter came to his house. She did so about the beginning of June, and Mrs. Stevens came over, and said to Mrs. Coulter, she understood Mrs. Coulter had a daughter, who was coming to prove that she had stolen some will; and she wished her to advise her daughter, mother ought, of the nature of an oath; and to as a speak nothing but the truth. She said nothing about taking the little girl. Jones had brought the girl to witness’ house, and wished witness to buy her time of him.
Mrs. Elizabeth Brown. Mrs. Coulter’s little girl was anxious that witness should take her, as both she, and her mother, wished her to leave Mr. Jones. By this means witness became acquainted with Mrs. Coulter, who had since been at her house four times. Mrs. Stevens requested witness to let her know when she came there. She did so, and Mrs. Stevens came over, and told Mrs. Coulter, she had heard her daughter Abby was coming to swear against her or Mr. Stevens, about taking the will. That it was her duty to advise her daughter to speak the truth, and nothing but the truth; that she wanted no favours ; all she asked was the truth. Mrs. Coulter said she would see Abby, as she was sure she did not know any thing about it. About three weeks before the trial, Mrs. Coulter called at witness’ and asked if Mrs. Stevens was at home. Witness said she did not know. She then went over, and soon came back, and said Mrs. Stevens was not at home, and Mr. Stevens answered her very short; she supposed he did not know who she was. She left no message for Mrs. Stevens.
Garret D. Wall, esq. The observation related by Mr. Potts, in his testimony, as made by Maj. Stevens, in wit *722 ness’ office, was made by him in answer to a jocular remade by some person present, that Joseph Vancieve charged his wife with taking the will, and would prove it by his daughter and bound girl. Maj. Stevens answered, seriously, that it was impossible their story could be true; that it was impossible for them to have seen him, through the window, in the chamber, at the desk.
*Maj. John Phillips, again. The land conveyed by testator to John, was about eighty acres, east of the road, and twenty acres of wood, west of it. The whole farm was said to lay for 254 acres, and was so given in to assessors; but witness supposed there was between 270 and 300; and that it wras worth between 60 and 65 dollars, per acre. The house, barn, and principal improvements, were put on by testator, more than twenty years ago. Joseph had brushed it up some, and put on a crib, and some small improvements. He had no property, independent of his father. Testator, for two or three years before his death, altered materially, both in body and mind; and lost his memory and recollection very much.
Rebecca Reed. Lives with Maj. Stevens. On Friday last, he returned home, before tea, and as he sat down to the table, the town-élopk struck seven. Benjamin Moore lives seven miles from Trenton.
Dr. Joseph Phillips. Was intimately acquainted with testator; -and was once in his room, about five minutes, six or eight days after the paralytic stroke. When witness went in, his name was mentioned, and testator looked up, and put out his hand to shake hands with witness, but did not speak. After the wills were missing, and before testator’s death, defendant told witness once, and perhaps oftener, that he believed his sister, Mrs. Stevens, had taken them. In a subsequent conversation, perhaps three or four weeks after, he told witness that he had changed his opinion; and he now believed that Maj. Stevens took the wills ; but he did not, on either occasion, tell the reason for his belief. Witness is on very intimate terms with the defendant. Testator’s faculties, particularly his memory, were much impaired. Dr. Clarice was his family physician, but was not able to attend him in his last illness ; and Dr. Vancieve called to see him as a relation.
*723 Charles Reeder. Was a witness to a will made by testator, in 1814. About ten o’clock, on the Sabbath testator’s death, as witness was going to church, in a chair with Mrs. Reeder, he saw defendant come on foot, out from Mr. Pharcs’, and asked him how his father was; he replied, very poorly; he did not think he could live more than two or three days. Witness and defendant had a difference, about a line, since 1814, and witness’ uncle Andrew, and defendant, had some very harsh words about it.
* Charles Ewing, esq. In 1814, defendant brought to witness, a will, of some years precedent date, and informed that testator wanted some alterations made, so as to guard against the claims of his daughters, to the Monmouth property. Witness made a draft, according to the instructions, and directed defendant to get his father to copy it. Witness never saw testator about this will, nor received any written instructions from him, concerning it. Gould not speak, with any great certainty, about the provisions of the former willbut his impression was, that the land was given, in it, to defendant. The will, now in dispute, is the draft -witness made.
Dr. Midiólas Belleville. Had not seen testator while he was sick, and could speak of his situation and disease only from the representations of the witnesses. He understood that one side was inanimate, and that he lay several weeks incapable cf speaking. If this were so, his mind must have been destroyed, so that he could not dispose of his property; his disease was in his head and brain. An affection of the palsy may be partial, but where the head is affected, it generally affects and deranges the mind. There may be exceptions to all general rules, but it would be a strange exception if Benjamin Vancleve had any considerable share of mind left. His living a considerable time, is no evidence that his mind -was not affected.
Joseph Bulloch, attended the court as a witness for defendant. About five or six weeks after testator’s death, witness called to see defendant, and defendant said that his sister Phebe had taken the wills. Witness said, he did not -want to hear any thing about it, it was a serious piece *724 of business; and asked him if there were any keys lying about that she could use? He replied, there was a closet key which would open the desk, and which she knew as well as he; that he had called her up stairs and accused her, and her countenance betrayed her, and he was sure it was her. About a month or six weeks after this, witness called there again. Defendant then said, that he was certain Phebe was clear; but that the major had taken it, and that he had told Mr. Stockton so ; that he could not actually prove that he took it, but could prove by the girls, his daughters, and Abigail Coulter, that he had been seen at the desk, and since he had found this out, they did not make such a racket about it. Witness said he wondered he had not found that out before he charged it on Phebe. He re*plied; that the girls were children, and said nothing about it, and he did not think to ask them ; that they were in the garden and saw him at the desk. Since that time defendant has always said it was the major, and he did not think that he would appear in court. Since testator’s death, defendant told witness, that by the first will, Betsey, who was then single, had a legacy of $600, and certain privileges in the house. After the first conversation, witness saw Mrs. Stevens, and told it to her; and after the second, he saw Maj. Stevens, in Trenton, and told it to him ; and the major replied, “ he’s a fool, I’ve not been there this three years.”
Witness was in the habit of visiting at testator’s, and was well known to him; but witness had not seen him for the space of a year, when he called there, about a year before his death, when witness was much struck with his alteration, and the failure of his memory. He did not know witness, but-being told who he was, recollected witness, and inquired for his father. Witness told him he had been dead a year. After staying a little time, witness was about to go away, when testator told him to tell his daddy to come and see him. Witness had a curiosity to see how testator’s judgment was, and asked him what he thought of his horse, and if he would trade? He said no, he left all those things to his son. Witness then asked testator the age of the horse; he examined his mouth, and told his age very exactly. Witness supposed, if testa *725 tor had paid him $100, he would have forgot it in a few minutes, and paid it over again. His memory had alto-' gether failed.
Richard Stockton, esq. The first week in March last, defendant came up with witness, in the road, and said, “ Mr. Stockton, I told you that my sister had taken the wills. I have altered my opinion, and I believe now, it was Maj. Stevens who did it.”
Here the plaintiff rested, and the defendant called again.
Fi'azee Ayers. Who was at Dr. Clarke’s in July, 1809 ; and then Dr. Clarke was married, to his present wife, one of the lessors.
The testimony on both sides being closed, the cause was very ably and eloquently summed up to the jury. Wall opened for the plaintiff; Attorney-General and Ewing, answered for the defendant; and R. Stockton, replied for the plaintiff.
Before the argument was finished, Justice Southard left the court, to attend a distant circuit.
*As the argument progressed, the plaintiff offered Sally Howey, as a witness, she having just been brought from Philadelphia. She testified, that she had worked in Dr. Clarke’s family eight years, and left it last March. There was in the house no bunch of keys, with a ring and catch. There were some loose keys about the house ; but there was only one bunch, which belonged to the bookcase, and that had one large, and two small, keys, on it.
The Chief Justice directed the constable to be sworn, to attend the jury, -without charge; but the counsel of the plaintiff expressing a strong desire for a charge, he did, in a few words, state the law applicable to the case.
The jury found a verdict of not guilty: whereupon, R. Stockton, for the plaintiff, moved a rule, to shew cause, why the verdict should not be set aside; and stated, as reasons, 1. That the court had erred, in the admission of illegal evidence. 2. That the verdict was contrary to law and evidence.
This rule was granted, and the following reasons subsequently filed.
*726 1. The court permitted unlawful evidence to be given - to the jury, to wit:
1. Divers conversations and communications of Benjamin Vancleve, the ancestor, with different persons, from 1802 to 1814, for the purpose of proving his original ' intention, to leave the premises in question, to the defendant ; which parol communications were irrelevant, and calculated to lead the jury from the single point upon which the title of the defendant depended; that is to say, the testamentary capacity of the said Benjamin Vancleve, on the 26th August, 1817.
2. Parol evidence, of the contents of divers alleged wills, of Benjamin Vancleve, without the production of those wills, and without the defendant’s having first sufficiently accounted for the non-production of such wills.
2. On the trial of the cause, the court refused to examine, or permit to be examined, previously to her being sworn, as a witness, one Abigail Coulter, a witness, produced on the part of the defendant, in relation to her knowledge of the nature and obligation of an oath, although it appeared, that she was only of the age of sixteen years; was a servant bound to the defendant by the overseers of the poor of the township of Lawrence, and *then living with him as such servant; and, as the plaintiff alleged, had never been, before, sworn or examined as a witness.
3. The verdict was against the charge of the court, to the jury.
4. The verdict was against the evidence given in the cause.
5. The lessors of the plaintiff, heirs at law of Benjamin Vancleve, under whom both parties claim, were entitled to recover, and ought not to be disinherited, without the production of a will, fully and satisfactorily proved, both in regard to the fact of execution, and the capacity of the alleged testator, to make a will of lands; at the time. Whereas, the jury have found a verdict, for the defendant, against the said heirs at law, under the pretence of a will, which was never really executed by the said Benjamin Vancleve; and although he was not of a sound and dis *727 posing mind and memory, when the said pretended will is said to have been made.
The argument of the rule, for a new trial, was had at Febrv.ary term, by JR. Stockton and Wall, for plaintiff: L. II. Stockton and Fwing, for defendant. The reporter regrets, that the length of the report is such, as to forbid inserting the whole arguments. The following is a sketch of the points and authorities relied on.
Wall, in support of the rule.
The doctrine respecting new trials, is so well understood, and the necessity of resorting to them, at times, to attain the substantial ends of justice, is so generally admitted by every jurist of the present day, that it is necessary only to refer to 3 Bl. Com. 390, for the principles on which they are awarded. The plaintiffs here claim, as heirs at law, and their case was fully proved. This right must be overcome by the defendant, and in order to do this, he must not only shew the formal execution of the will, but that the testator was of sound and disposing mind and memory. 3 Cok. part 6, p. 23. Pow. on Dev. 70. 2 Atk. 151. Cowp. 70. The burden of proving sanity, and the ability to dispose of his lands, with reason and understanding, lies on the party who alleges its existence, especially where probate has not been granted. 1 Mass. 71. Pow. 146. 2 Vern. 56, 293. 1 Vern. 293. In the language of the statute, Pal. 190, and in the language of the will also, it must be shewn that the mind and memory were sound and disposing; were whole, unbroken, unimpaired, unsliat*tered by disease or otherwise, capable of recollecting, discerning and feeling the relations, connexions and obligations of family and blood. 6 Jac. L. D. 436. Esp. 56. 2. Cro. 497. South. 154, Den v. Johnson. These authorities furnish a much safer guide than Swinburne and Codolphin, which. exhibit a mass of uncertainty'' and confusion. The testamentary capacity was not proved by the defendant. His witnesses exhibit him as torpid, unable to write or speak more than two or three words at a time; making the will by question and answer; and two of them agree, that he had not capacity *728 to make a deed. Besides, they were inconsistent, and ■ contradicted each other, and related the transaction differently, while it was fresh in their memory. An attestation to a will, so made and proved, will not be sustained by the court.
Subscribing witnesses are more to be attended to than others, because they are supposed to have better opportunities of judging than others, but they, like others, must render the reason of their opinions, and when they do, the court must determine upon their correctness. The capacity of the testator must be estimated by his words and actions, both of which are, in this instance, insufficient. It is manifest that the witnesses run away with an ideal and unfounded distinction, and concluded that he was capable of making the will in question, though not in general capable of making a will. It was said to be a copy of a former will which he had made and remembered ; but of this there is no satisfactory proof. Besides, this is a mere begging of the question, assuming the point in debate.
On the other side, the situation of testator’s mind and memory, before the paralytic affection ; his forgetfulness of his neighbours, and even his own family; his state during his last illness, but especially the night before and night after this execution of the will; his torpor, and unconsciousness of all physical wants, and the requirements of nature; his neighbours never hearing him speak; the more respectable of them not being called in as witnesses, in so doubtful a case; the manner of executing the will, as detailed by the defendant himself, to Reeder ; all exhibit ample evidence that he did not and could not make the will. It would have been a miracle had his mind been restored, and tongue loosed, for this occasion. The idea of sustaining the will, upon the ground that it was a copy of a former one, is untenable. It must stand or fall by itself. There is no proof of the contents *of the former will, except defendant’s declarations; even his daughter does not prove them. Nor is there proof of its loss. The defendant had the custody of it himself, and might have destroyed it. The Chief Justice expressly *729 charged the jury, that there was no proof that any of the plaintiffs ever took it.
Again. The evidence of testator’s declarations was unlawfully admitted. It was, in effect, shewing an intention to do an act, in the place of the act itself; a substitution of a parol, for a written will, against the very words of the statute. A will is a complete and consummate act of itself, and no collateral proof is admissible to sustain or explain it. No matter how long he entertained the intention, how fondly he cherished the idea, if he did not consummate the act itself, while capable of doing it; you cannot dove-tail and splice the mind to it, and gather the mind from the previous declarations. Pow. 68, 481, 652. 1 Salk. 232. 2 Ver. 333. Those declarations are not within the issue of sanity at the time. 1 Mass. 72. 9 Mass. 227.
Nor were they competent, as rebutting the charge of fraud. If any were charged,‘it was by implication only, as resulting from defendant’s procuring the will at the time, and in the manner, he did. And if this justifies the evidence, the consequence is, that fraud is charged, and declarations are admissible, wherever sanity is questioned.
Again. The Chief Justice stated the capacity necessary to make a will. Such capacity was not proved, and therefore the verdict was against the charge of the court.
There was also an error in the court, in its refusal to interrogate Abigail Coulter. The plaintiff had a clear right to this interrogation. A person is incompetent, as a witness, who does not believe in the being of God, and does not comprehend the nature and obligations of an oath. 2 Bac. 576, Evi. a. Sw. Evi. 47. 1 Atk. 45. Phil. 14.
L. II. Stockton, in answer. Among the various points of difference between him and the opposing counsel, there was one in .which they agreed; that this motion was addressed to the discretion of the court; but this discretion was not an arbitrary power, to act by caprice, without lawq and against right; but a judicial discretion, regulated by an attention to the principles of justice, truth, and reason ; guided by the common law, and limited by *the *730 authority of precedents. Morg. 257, 284. 5 Co. 100, a. 2 Wil. 807.
This application is by a plaintiff in ejectment, after a trial at bar, and verdict for the defendant, without fraud or surprise; and' is therefore extraordinary, novel and unprecedented; and the argument against it, is naturally divided into objections arising, first, from these circumstances, independent of the acts of the court and jury; and, secondly, an inquiry into the legality of what was done by the court and jury.
1. It was a trial at bar, which, of itself, is considered, in many ancient cases, conclusive against a new trial. 2 Salk. 648. 1 Ld. Ray. 514. Carth. 507. Sir T. Jones, 134, 225. And. 324. Cox 69. It is not like a verdict in a personal action, where it is a conclusive bar, for plaintiff may bring a second ejectment.
2. The verdict is for defendant, and there is no case of trial at bar and verdict for defendant, where the verdict has been set aside, upon objections to error in court or jury, or upon the merits, abstracted from fraud, surprise or malfeasance of the party relative to the trial. And. 324. 1 Black. R. 348. 6 Com. Dig. 404. 4 Bur. 2224-5. It is true there are some obiter and sweeping sayings of lord Mansfield, respecting the power of courts on this point, yet even what he says is against the propriety of setting aside a verdict for defendant in ejectment. And besides, with all our respect for his learning and talent, nam nihil tetigit quod non ornavit, yet we cannot fail to remark, that he felt too strong an attachment to the Justinian code of the civil law, where the jubentia prcetorum or decree of the court, was.every thing, and the jury nothing. Loft. Mil.
3. Ejectments savour of the nature of a criminal action, both in form and in the questions often tried in them, as where frauds or forgery of deeds is alleged. See Chew v. Tatem, Driver v. Sparks, and other cases. This’ case is strongly of that description. The plaintiff alleged, and attempted to prove, against the defendant, conspiracy, fraud, intimidation and hard usage towards the testator, his father, who is alleged to have been an almost inanimate being ; and. subornation of perj ury, in relation to Johnson, one of his witnesses; charges which, if true, *731 rendered defendant liable to be indicted aS a culprit. 2 Bur. 1127-9. 3 Bac. 549, Ind. E. Pat. 232. These charges the jury negatived, and the court ought not to interfere and deprive the defendant of the ^shield of innocence afforded by the verdict. 4 Bur. 2257. Loft. 451. Cowp. 37.
Having presented these legal obstacles to a new trial, it is proper to examine the reasons relied on by the plaintiff, and
1. Respecting Abigail Coulter. It is not denied that the general principle urged by the counsel and proved by his authorities, is correct, viz., that a witness should believe the being of a God, and discern the nature and obligations of an oath. But fourteen years being the age of legal discretion, Harg. Co. Lit. 247. b. Gilb. Ev. 130. H. P. C. 263. 2 Hawk. 434. Inf. Law. 30, all persons over that age are presumed to know the law, (Loft’s Max. 10.) one important part of which is, the Christian religion, which teaches these truths. Loft’s Max. 9. 10. 19. m. 2. 3. 203. 1 Bl. Com. 41-2. 22 sec. Const. of N. J. This knowledge then, being presumed, it was not necessary to prove it. No man can allege ignorance of the law. Gilb. 148. White’s case, which has been cited from Swift, was decided at the Old Bailey in 1786, (2 Leach 46) and is not law here. Moreover it was an obiter, sub silentio proceeding, and merely shows that the court thought, that in that case, it had the power to propose such questions; and its exercise was perhaps justified by the state of society and the character of the persons who usually appear in that place, in that great city, which Dr. Johnson, in his celebrated poem which bears its name, calls, “ London the needy villains’ general home.” But this reason cannot apply to a witness apparently intelligent and respectable, educated in a civilized and Christian neighbourhood and family, under the ministrations of a faithful and zealous clergyman. Such gross ignorance would be disgraceful, and therefore she ought not to be compelled to disclose it. Swift 49, 50-1.
But if, in technical strictness, the previous interrogatories should have been put, still the verdict must stand, because no positive injury has been done. 1 Bur. 5,4. Oro. *732 Jac. 640. 3 Wills. 272. Her testimony was collateral, not perhaps important, and stands without question.
2. Upon the third reason, that the verdict was against the charge of the court, it is sufficient to say, that the counsel have relied upon a general allegation without stating one particular or specific matter, and that no such contradiction in reality existed. The nature of the case was such, that an explicit charge or *opinion of the judge, on the merits of the case, could not, with legal propriety, have been given. The charge could be no other than hypothetical, and referring the adjustment of disputed facts to the jury. Bushel’s case, Vaugh R. 143-4, &c.
3. The admission of unlawful evidence, which is the principal ground of this motion, is said to be of two sorts, 1. Divers conversations of the testator, from 1802 to 1816, tending to shew his intention to give the land to defendant ; and 2. Parol proof of the contents of certain wills. As to the latter of these exceptions, Abigail Coulter, Mary Vaneleve, and John Phares, proved that such wills had existed, and could not now be found. Two of the lessors, Mrs. Clarice and John Stevens, were also proved to have confessed this fact. It was, therefore, competent, upon the strictest legal principles, to prove their contents. But this evidence was not objected to, in this light, at the trial, and the objection ought not, therefore, now to prevail. 3 Bur. 1255. Lev. 202. 10 Mod. 202.
But the other part of this exception is most important; and the decision of the court is defensible on two grounds. 1. As original evidence. It was the conversation of the ancestor, under whom the plaintiffs claim, relative to the land, and stands on the same ground as the declarations of the party, relative to the subject matter in dispute. The privity of right, or legal unity, is most strict between heir and ancestor. 4 John. 280. 2 Dall. 93-4. But, 2. The evidence was clearly competent to show, that defendant had not, as was pretended, taken an undue advantage of testator’s situation and dotage. To prove this, plaintiff had sworn sixteen or seventeen witnesses, none of whom were present at the execution of the will, or spoke of his capacity at the time; but all of whom spoke of acts, conversations, and conduct, weeks, months, *733 and years previous; and one of whom pretended that defendant treated him harshly, and intimidated him. After this parol evidence, it was surely competent to rebut it, by parol, shewing a different state of facts, agreeable to the ancient common law maxim; eo ligamine quo ligatur, dissolvitur. Noy. 11. 1 Bl. R. 60. The contrary doctrine leads to this result, that parol, collateral, evidence, is competent to create presumption of fraud, in order to avoid a will, but incompetent to rebut a charge of fraud, and sustain a will; as if the law delighted in frauds, whereas, the contrary is the fact. Noy. 28, sec. 33.
*Two considerations are here important. 1. What evidenceis. 2. The circumstances under which the evidence objected to, was given. 3 Bur. 1255. Blackstone, in vol. 3. page 307, says, that evidence elucidates, &c. the point in issue. Now, what is the issue here? Was the will executed in a state of legal capacity, or extorted by fraudulent importunity, from a debilitated, doting, old man, in extremis? The witnesses gave conflicting opinions; and several of plaintiff’s, as Bullock, Cook, and others, detailed conversations, to show his want of memory. Can it then be otherwise, than competent, to elucidate the point in dispute, bj7 detailing what he said on the subject matter of dispute ? and his intentions to devise, in the precise manner, he did devise? This would be a partial and inequitable rule ; and the rejection of such evidence, would, on a bill of exceptions, be, at once, corrected by the Court of Appeals; as the counsel must believe, since they have deserted the bill which they took at the trial.
But Rowel, Vernon, and others, are read, to shew that a will must be in writing, executed by the testator, in a state of sanity, and in the presence of witnesses, &c.; and that declarations will not, in themselves, amount to what the law requires. This is true. But the objection is not solid ; it is to a part of the evidence, because, that alone, is not sufficient. The defendant did produce a will, in writing, executed in the presence of witnesses. The plaintiff then alleged, that the testator was incapable, and subjected to fear and undue influence, and gave parol proof to support his allegations. The court will certainly permit that parol proof to be rebutted, and will not forget one part *734 of the evidence, and then reject another, as wanting in effect. The argument of plaintiff is this: we are heirs at law; you set up a will; we combat it by parol; you must not answer by parol, because y'ou cannot establish your estate by parol. As if, in a suit on bond of testator, defendant tried to prove fraud ; plaintiff offered to rebut it by proof of his declarations, that he borrowed the money ; and the defendant should answer, that the proof was inadmissible, because a claim on bond could not be supported, by parol alone, without a bond. In Chew v. Totem, Driver and Sparks, in Gloucester, and Couch v. Sheppard, at Salem circuit, such testimony was admitted, without objection. Of the ground of its admission, little need be said. Cases involving charges of fraud, always afford an exception to general rules, on strict principles. *Here, as plaintiff had a right to do, (1 Mor. 184) he made a charge of fraud. Fraud avoids all acts; and the concurrent jurisdiction of common law with equity courts, admits a latitude of presumptive proof in the former, respecting it. 1 Mor. 288. Park, on Ins. 242-3.
The fourth reason assigned on this motion is, that the verdict is against the evidence. This teason is unsupported by the case.. Here Mr. Stockton presented his view of the case, as it appeared upon the evidence, maintaining a clear and decided preponderance in favour of the correctness of the defendant’s conduct, and the sanity of .the testator. He then argued, 2. That if the court thought the evidence doubtful, or that the jury misjudged, and that they, as jurors, would have given a different verdict ■ still they could not disturb it.: The subscribing witnesses, with Mary Vancleve, spoke conclusively and clearly, of the testator’s capacity, at the time. They are all consistent; most of them unimpeached and unimpeachable. The plaintiff’s witnesses did not see him, at the time ; and they who spoke of his failings, detailed only a loss of memory, while they gave some remarkable instances of his judgment, as in the age of horses, and the value of money and land. If a verdict had been given against such evidence, the court would have set it aside. But be this as it may, there was evidence for the defendant; and of this evidence, the jury were the constitutional and *735 exclusive judges ; and their verdict, unless capriciously against all evidence, must be conclusive. The between the court and jury are as specifically and clearly defined and ascertained, by legal writers, and positive adjudications, as any in the extensive sphere of forensic science. 3 Bl. Com. 392. No case can be produced, of a new trial, upon the mere allegation, that the verdict was against evidence, where there was evidence on both sides. 3 Wil. 38, 45. This case, and the opinion of the Chief Justice in it, explain the true grounds on which this question rests; and is the more valuable, because argued and decided twelve years after Crips and Eynon, where the doctrine of new trials is largely laid down. Other cases are in conformity with this. 2 Str. 1142. 7 Mod. 117. 1 Wil. 22. 1 Bl. R. 1. 12 Mod. 128. 5 Bur. 2805. 2 Str. 1105. Nor have American judges been slow in recognizing this great constitutional right, to have the facts decided by jury. 2 Dal. 121. 4 Dal. 390. 3 John. 170, 271. 5 Mass. 353, *355, 229. Coxe 228. Nor is this coineidence remarkable. They are all founded on the common, venerable and estimable, basis, of the common law; which directs the court to judge in matters of law, and the jury in matters of fact. Maxims, in the law, are of powerful weight, (15 Vin. 351. 2 Inst. 210) and these enforce the principle contended for. Loft’s Max. p. 11, max. 37. Judicium duodecim, &c. Max. 48. ad quest, facti, &c.
In this cause, the principal matters in dispute before the jury, were not of law, but respected the testator’s capacity at the execution of the will. Now in Den v. Moore, 2 South. 470, and Den v. Johnson, 2 South. 454, and in the charge of the Chief Justice in this case, it was expressly held; that this matter was within the exclusive and peculiar province of the jury. Yet, still the plaintiffs wish the court to arrogate to themselves, this great constitutional right of the jury, to pass on disputed facts; a right secured by magna charta ; so endeared by a knowledge of its value, in securing the blessings of civil liberty, that a suspicion of an intention to deny it, was one of the grievances wdiich first agitated our fathers, in the commencement of the revolution; a right, formidable only to tyrants; but of such high value, in the consideration *736 of the patriots oí'New-Jersey, in ’76, that by the 22nd of the constitution, they engrafted it into our system, and restrained the people from depriving their posterity of its benefits; confirming it without repeal for ever. This privilege is claimed for the defendant. He has been acquitted ; pronounced not guilty of the charges against him ; by a jury, as respectable, for integrity and intelligence, as ever appeared at this bar. He is confident, when he asks, that this shield be not taken from him, he will not ask in vain.
Wall read the following cases, on the question of a new trial, after a trial at bar. 1 Str. 534, 1105. Stiles 462. 1 Bur. 390-5. Bl. Rep. 345-8. 4 Bur. 2224. Pen. 37.
Ewing, on the same side. This verdict, from the character and condition of the parties; the extent of the evidence; the deliberate nature of the trial; and the respectability of the jury; possesses every mark worthy of attention; and on behalf of the defendant it is denied that there is either precedent or law, for setting it aside. It is a verdict, after trial at bar; in an ejectment; for the defendant: circumstances not combined in any other *case, where a new trial has been granted. 2 Salk. 648, 650. 7 Mod. 156. 6 Bac. 674, trial L. 2 Stra. 1105.
But if the ordering of a new trial, in such a case, were within the course of practice, there are here no sufficient grounds for it. Let us examine the reasons assigned; and 1. The admission of unlawful evidence. This is no ground for setting aside a verdict, after a trial at bar. Such proceeding would be an appeal from the same court to the same court, which can never, legally, be called on to review its own opinions; it would be inconsistent with the first principles of our jurisprudence. To justify the court in supporting this motion, the plaintiff should shew that such a. power has heretofore been exercised; but no case can be produced from the books, where, for such ground, a verdict at bar has been set aside or the question even raised.
The defendant might rest upon this answer, but it is *737 not necessary, for an examination of the objections to the testimony, will dispel every pretence for a new trial. -
First then, as to the declarations of the testator. It will be well recollected, what these declarations were. Such evidence of the antecedent views and feelings of the testator, is competent at all times, on a question of capacity. A mind, once vigorous .and sound, is alleged to have become imbecile, disordered, and shattered. How may this be ascertained? By comparison of its views, feelings, acts; with the views, feelings, acts, and intents, of a period of acknowledged capacity. Derangement consists in a departure from ordinary habits of thought, speech, and conduct. Rush Led. 366. It is all important, therefore, to ascertain the ordinary habits. If a will be conformable to a man’s settled arrangement, a transcript of his mind when in acknowledged vigour, there is every reason to believe the mind sound at the period of the act. This conformity must be ascertained by proof of previous declarations and intentions; and if such conformity be shewn, the presumption, that the vigour of the mind remained, is strong. Reverse the picture. Suppose it be proved that the testator was never heard to suggest such a disposition, as the will contains, but that he always intended to make a different will, the testimony would be both competent and overwhelming; and if so on one side, it is so on the other. It is not pretended to be conclusive but admissible ; and, in fact, evidence of this kind, is, on all occasions, received.
*But 2. Whatever may be the rule in general, this evidence was clearly admissible, when offered. The plaintiff had opened to the jury, that this will had been procured by fraud and imposition ; that the testator was a machine in the hands of his son ; that from his state of dependance and the control exercised over him, by his son, he was , not his own master; but had been moved to make a will agreeably to his son’s wishes, and not his own ; and the plaintiff had actually produced two witnesses, Reeder and Gastner, to support this opening. To repel the charges and overcome the proof, it was right to shew his previous declarations and intentions; for they proved ; 1. That no control was exercised over him, for he did what he always *738 intended to do» And 2. That no fraud was practised, for he was not made to speak otherwise than he always intended. If an executor be sued on his testator’s-bond, and he allege that it was obtained by fraud, would it not be competent to prove that the testator had acknowledged he owed the money, and repeatedly declared he intended to give such a bond ? If the plaintiffs could have followed up Reeder and Oastner, by proof that testator had uniformly, and for years, declared that he meant to make a different disposition of his property, he would have offered it with triumph and pressed it with urgency, and it would have influenced the jury with force. The same measure ought to be permitted to the defendant. The principles, here maintained, are sanctioned in Pennsylvania. 1 Yeates 108. 2 Yeates 46.
3. This testimony is admissible, in another view. The defendant had two objects. 1. To prove a general testamentary capacity. 2. To prove a capacity to do the act ip question; to understand, approve and execute a will, which he had previously arranged and settled in his own mind. Evidence of such capacity was given: and this testimony was calculated to shew that he had previously made such arrangements, and had, for a considerable time, settled in his mind the will he intended to make.
But it is objected, that a will must be in writing. This is true, but it does not follow that all evidence, relative to the will, must be in writing also ; here a will was produced, not supplied by parol. Powel 481, only proves that parol evidence may not be given to construe a will. Again, it is said, not to be within the issue. What was the issue? Not capacity alone, but whether the will had been fairly obtained : Not, not guilty, but all the prominent *facts necessary to a recovery or defence. This testimony is applicable to them.
2. As to the evidence of the contents of the wills. 1. The evidence offered and given, was not of the contents of written instruments, but of the declarations of the testator, with regard to the disposition he had made, and intended to make, of his property. It is not, therefore, within the rule respecting the parol evidence of the contents of papers. 2. The plaintiff introduced such testimony *739 by A. Reeder, esq. 3. No objection was made on this score, at the trial, it is now too late. 11 John. 71. 3 Bur. 1253.
IR Stockton. The court does correct its own mistakes. Coxe 12 and 13, 48 and 78.]
3. As to Abigail Coulter. She was sixteen years old. A witness at fourteen has a-legal discretion, and no previous examination is to be made. Her credibility is for the jury. Gilb. 147. 2 Hale P. C. 278. Swift 46. Peake 123. Even if there be a mistake, the court will not set aside the verdict, unless injury lias been done. 2 Caines 88, 90. Bac. Trial L. 4.
4. As to the charge. It was on three points. 1. That no precise line could be drawn where capacity ends and incapacity begins. 2. That the declarations of testator were admitted to repel the imputation of fraud, but not to supply' evidence of capacity, if that were wanting. And 3. That the jury might arrive at a correct verdict, without deciding the question of taking the wills. On none of these points is it at all perceived, that the verdict conflicts with the charge.
5. As to the verdict being against evidence. Here it is material to ascertain the power of the court, as established by law, to control the acts of the jury. They are organized for different purposes. The court must see that the jury keep within their province, but within those hallowed precincts, no court can enter. The effect and’infiúence of the evidence is the peculium, of the jury. The opinion of the court, as to the facts, is not the criterion of the validity of a verdict. If it were, why, “ cheat the deluded people, with a show of liberty; which yet they ne’er must taste of ?” why the mockery of a jury trial ? The rule is clearly this; if there be evidence on which, standing alone and uncontradicted, the verdict might rest, it shall not be set aside. 3 Bl. Com. 392. 1 Bur. 609. 1 Wil. 22. 3 Wils. 45. 2. Str. 1142, 1105. Cowp. 37. Pen. 947. 5 Bac. 664. Ben v. Merritt, in this court. In the pre*sent case so wholly did the Chief Justice deem it within the province of the jury, that he would have given no charge but for the importunity of the plaintiffs’ counsel.
With this principle of law, the facts of the case must *740 be reviewed, and the plaintiffs’ counsel must be followed, -though he did exhibit the strange spectacle of addressing the court upon matters of fact. Picking up a scrap here and a shred there, he would present this thing of shreds and patches, as the whole of the garment the defendant had to cover him. The judges who heard the evidence can receive no unfavourable impression, from such a view of the case, and the one who was absent will find the best corrective, in a full examination of the evidence. Here Mr. Ewing proceeded to discuss the case, arguing that it was conclusively with the defendant.
R. Stockton, in reply. The objections to this rule may be thus classified. 1. Such as depend upon the nature of the suit and the verdict of the jury, without taking into consideration the judicial opinions given on the trial, or the verdict on its merits. And 2. Such as relate to those opinions, and that verdict, on the merits between the parties.
In the first class, two grounds are taken. 1. That this is a suit, in its nature criminal, where a verdict has been rendered for the defendant. There are degrees, even in unfounded propositions, and this is, of all, most destitute of basis. It is a rule of law, that in a criminal prosecution, or suit substantially so, where defendant is acquitted, there shall be no new trial. The principle is beneficent and merciful, but to apply it, the proceeding must be, in form or substance, criminal. These are, at common law, first,indictment; second, information; the object of which is, punishment; and if ever applied to other cases, it is because they have substantially the same object. The inquiry is, what is the nature and object of the suit? not, what questions or contestations arose in its progress and trial? Now, that ejectment is a criminal prosecution, or in nature of one, has been reserved, for discovery, till this time. It is a suit of the highest order, a substitute for real actions; its object and result, the title of land. Its nature is not altered by the facts in controversy. In this it is like personal actions. Collateral questions may arise in them, containing charges of a criminal character against party or witness. As *in debt of bond; plea, pay *741 ment, and receipt offered; plaintiff may allege that it is forged; so, that a witness to actual payment, was perjured. Yet this would be no obstacle to new trial, if there was otherwise good reason. The case of Crips v. Eynon was assumpsit, the question forgery, the verdict for defendant ; yet there was new trial. 2 Bur. 1127, shews that the frauds which are indictable are of a public nature, against which ordinary prudence could not guard, not such as that, charged on this defendant; yet even if they vrere such, it would not alter the case; this ejectment would still not be a criminal suit. The case in Cowp. 37, is a short note and badly reported. The reason assigned is not the true one; it should have been, that it was a hard action.
2nd objection. There can be no new trial, in ejectment, by special jury at bar, and verdict for defendant. There is nothing, in Neio-Jersey, in any of these objections; all have been separately overruled, and their aggregate can have no avail, as an impediment. 1 Sir. 504, and 1 Bl. R. 345, were ejectments-and trials at bar. 1 Bur. 395, and 4 Bur. 2224, were special juries. Den v. Driver, Coxe 166, and 1 Pen. 37, were verdicts for defendant ; and yet, in all these cases, new trials were awarded. It is palpable that there is no sound principle to support any of these objections, and, where there are grounds for new trial, to compel the plaintiff to pay the costs and bring a new suit, with the influence of an improper verdict against him. Justice and convenience require, that in ejectment as well as every other suit, the court should submit to no restriction, which interrupts the attainment of the real justice of the case. Den v. Allen is conclusive on this point.
The second class of reasons, relate to the judicial opinions pronounced on the trial, and to the verdict. And here it is said, that if this court did admit illegal evidence, it cannot correct its owrn errors and award a new trial. Neither precedent nor principle sanction this idea. No writer lays down such a rule; on the contrary, every reason is against its establishment. Error may creep into a trial here as well as at circuit, and should not be without redress. It is proper and correct that it *742 should be redressed, and such is not only the necessary -practice of the Common Pleas, but the constant practice of this court also. See Cove Rep. Let the court think what they may, or can, of the sanctity of a verdict, they will never suffer it to stand, if they are convinced that they ^deprived the plaintiff of any right, or did him any injury on the trial. In such case, the trial can neither be fair nor satisfactory.
1. The first error of the court, was, in refusing to permit an examination of a young female witness, on her voir dire> touching her knowledge of the nature and obligation of an oath. She was a servant to defendant, hound as a pauper by the overseers; had never been sworn ; and was called to confirm the testimony of a child of fourteen, which was chiefly intended to fix on plaintiff, the imputation of stealing the will of 1814. Her discretion and knowledge were, therefore, very important. The influence of her evidence on the jury, no one can tell.
It is competent to examine witnesses, old or young, to ascertain their discretion, and how they appreciate their duties, and the nature and obligations of an oath; and the books never speak of their ages when this examination is made ; it is not confined to those under fourteen. A witness must have discretion and knowledge, and these may not exist in all who live in a Christian country, in a godly family, and near a church. You can ascertain their existence only by an examination. This examination has been confounded with the question when an infant may be sworn as a witness ; which may be at fourteen, if youth be the only objection. The law, then, presumes discretion and knowledge; but the presumption may be rebutted, and can only be rebutted in this way. In White’s case, read from Swift, he was evidently an adult, (Leach 368) and the inquiry never has been refused, because the witness was fourteen. Gilb. 13. Swift 49. 2 Hale 278. The assertion, that witness may not be so questioned in England,-is incorrect.. Phil. 18. He may be examined further, as to his religious opinions. 2 Wil. Bac. 577. Evi. a note. The proper question to try competency, is not, if he believes in Jesus Christ; but in God, the obligations *743 of an oath, and a future state of rewards and punishments. This is a restriction of the old rule, and was in- - troduced by Buller. 1 Peak. N. P. 11.
3. The court admitted parol evidence of the declarations of testator, from 1802 to 1814, of a steady, uniform intention, to leave this land to the son. On this point, there are two inquiries : 1. Were these declarations evidence, per se. f 2. Were they made legal by the plaintiff?
1. The,y were illegal, because not within the issue. This principle is clear. Evidence not within the issue cannot be received. The issue was, guilty, or not guilty; but the title to the land was the general question-. The plaintiffs claimed title by descent. The defendant by devise. These declarations were no evidence to impugn the plaintiffs’ title ; he wanted no intent for his title. Then, as to defendant ; intent that he should have the land, could not aid him, unless executed by legal will. Even a will, in his own hand-writing, with two witnesses, to aid the intent, would not answer. Intent, without the act, is no evidence of the title. But it is argued, the particular issue was compos or non compos. True; but it was compos or non compos at the time. Now, declarations, fifteen years before, could not shed light on his capacity in 1817. If he had said, in 1802, that John and the daughters should have the land, it would not have been competent against the will: neither are the declarations, that Joseph should have it, evidence in its favour. This sort of evidence is extremely dangerous; 1. Because testators often intentionally conceal the truth; and 2. It is liable to misunderstanding, forgetfulness, and perversion, in witnesses, and is against the whole policy of the law, as to land. Mr. Ewing’s argument is not supported by any case or treatise; it is a refinement not found in books. Its fallacy is palpable. It substitutes an intention for an act, and takes the capacity for granted. If he intended, ever so long, to make a will exclusively in favour of his son, and then is made to do it in extremis, the previous intention cannot aid the act. It is directly opposed to the opinion of the Chief Justice, to the jury, that the declarations were admitted to rebut, and ought to have no influence on the will set up.
*744 ■ Some declarations are competent, and there is a sound, rule to test them. They must shew the mind, when the act was done; be at, or so near the time, as to * ' 1 be part of the res gestee. But the evidence in question, is also exceptionable, as original evidence. It is hearsay of the most dangerous kind, and within none of the exceptions as to hearsay. B. Vandeve was not on oath; he may have meant to deceive, and we must trust to frail memories for its accuracy.
But it is again argued, that they are the declarations of a common ancestor; a party. It is answered that he is no party, and the declarations of an ancestor, as to his intentions, are no evidence.
*2. It is said the plaintiff made it good, as rebutting evidence; 1. By alleging that he was non compos; and 2. Imposed on. Answer. Two distinct defences were not set up. He was said to be non compos; and being so, wras made to execute the will. Thus far, fraud is included in all questions of non compos, which presuppose the formal act. But fraud, as a distinct defence, admits the testamentary capacity, and relies on imposition. He might have made a will, but you procured this unfairly. Now, previous declarations are no evidence of present capacity, though they might, under circumstances, repel the assertion, that the testator was circumvented. Besides, there was nothing in Reeder’s, or Gastner’s evidence, which they could properly rebut. In 1 Yeates, 108, the declarations were shortly before making the will. In 2 Yeates, 46, shortly before, and after, so as to be part of the res gestee, as they must be, where used to rebut express fraud.
[L. H. Stockton cited 5 Bur. 2805.]
Again; parol evidence was given, of written dispositions of property, without laying a proper foundation therefor. There was no evidence of the loss of the wills, but the declarations of defendant. This was not sufficient ; the wills ought to have been produced. But, the defendant says, that he does not claim under the will of 1809 • it was offered, not as part of title, but proof ot uniform declarations. So much the worse. He does not claim under it, yet proves it; he claims under a will of a dying man, in 1817; and establishes it, because a will *745 was made fifteen years before. If the verbal declarations are not evidence, much less can this be. Again, he says, - that Reeder’s testimony led to it. Not so. A. Reeder was not called to prove the contents, and only mentions them, in detailing a conversation of defendant. But, if he had proved them, this would not have legalized proof of a will of 1809. Again: the plaintiff did not object, in this point of view. Answer. The plaintiff objected to it, 1. as opened; 2. as proved; and he is not estopped to urge any other reason. These two questions of evidence are conclusive, if plaintiff be right on either. The illegal allegations of uniform intent, carried all before them. It was the talisman which dispelled all doubts.
Lastly : the verdict was against the weight of evidence. Under this head, Mr. Stockton mingled a discussion of the law, with an investigation of the facts, and maintained the case, on the part of *the defendant, in its general complexion, was gross ; the circumstances attending the transaction, suspicious. The plaintiffs’ title is full and clear; and defendant must not only shew a will, but a sound mind in testator. Soundness of mind is a mixed question of law and fact. The dicta, in old testamentary books, are not to be relied on, in cases of wills of land, under the statute. Any thing would formerly do, especially if the disposition was ad pios usus ; but since the statute, wills are conveyances, and must depend, for their operation, upon the same principles. In Winchester’s case, lord Coke tells us, the mind must be perfect, enabling a man to dispose of his property with understanding and discretion ; and the Chief Justice, in Den v. Johnson, has defined this soundness, with more clearness and precision, and accuracy, than it has been defined since the days of lord Coke. South. 454. It is to be drawn from the situation of testator, before, and after the act; as, being in health, and of common understanding, or being sick and old, yet writing, or dictating the will: but, if by sickness or age, he has lost his mind or memory, or is speechless, and the will is prepared, without consulting him; or being importuned he assents, it is no will; there is no fact to prove a perfect and sound mind. The distinction *746 between a general, and'particular, capacity; a capacity to make a will, and a capacity to make the particular will, is unfounded in law or sense. When witnesses are sworn on the point, the inquiry is always general, and so is the oath of an executor. Here, the evidence, on both sides, proved the incompetency.
It is not intended to go over the doctrine of new trial. The court wants no teacher of the legal alphabet. The rules are settled ; and many of them unite in this case; value of the property; freehold ; length and intricacy of examination; two judges absent; the benefit of trial at bar, in a great measure lost, by a full charge not being delivered. The Chief Justice has stated why this was so; that all were fatigued, and the cause exhausted by argument ; but he was mistaken ; no cause is exhausted when he takes it up; his mind has more to convince and instruct, and persuade, than he will allow. If this case had been gone through by him, the result might have been, different. The plaintiffs had a right to.it; they did not receive it, and cannot be satisfied. The verdict is against the clear title of the plaintiffs, and the weight of evidence. A will ought not to be established on a sin*gle trial, where there is real doubt. A second trial will be more satisfactory; the parties better prepared; the court enabled to sum up the cause, separate its elements, and take off false glosses. Such a trial ought to be had, uninfluenced by the former verdict. •
Kirkpatrick C. J.
This was an action of ejectment, tried at bar, by a special jury, and a verdict for the defendant. It is now moved to set aside that verdict, and to grant a new trial.
It may be proper, before we enter upon the investigation of the case, to observe, that, from the course of the circuits, it became necessary for Justice Rossell to leave the court, before the cause was called on, and for Justice Southard, before it was closed and committed to the jury; so that in point of advisement, it was little more than a trial before a single judge, at.the circuit.
The case was this. Benjamin Vancleve, late of Lawrence, in the county of Hunterdon, was, in his life-time, and at *747 the time of his death, seized and possessed of a certain plantation and tract of land, containing nearly 200 acres, and estimated to be worth $12,000, or upwards. He left three children, that is to say, two daughters, Phebe Stevens, the wife of John Stevens, and Elizabeth Clarke, the wife of Israel Clarke, who, together with their husbands, are the lessors of the plaintiff; and one son, that is to say, Joseph Vancleve, who is the defendant, in this cause. The daughters claim, each, one third part of the said plantation, as heirs of their deceased father, under the statute; the son, who is in possession, opposes this claim by setting up a will by which the whole is devised to him, in fee ; and the daughters, thereupon, to support their claim, aver that their said father, at the time of the making the said pretended will, was, by reason of a severe paralytic affection, of which he soon after died, of nonsane mind and memory, and that, therefore, the said will is not good and effectual, in the law, to bar them of their inheritance, xlnd whether this bo so, is the single question.
The trial lasted many days; a great number of witnesses were examined, on each side; the testimony was summed up by the counsel with much ability; the jury retired from the bar, in a measure, without the advico of the bench, and after a deliberation of four or five hours, returned with a verdict for the defendant.
The plaintiffs now come into court and move for a new trial, *and assign their reasons, which, though six in number, may be reduced to these throe.
1. Because Abigail Coulter, a witness, produced by the defendant, and objected to by the plaintiffs, for want, of competent information, was admitted, by the court, to be sworn without being interrogated as to her knowledge of the nature and obligation of an oath.
2. Because the court permitted the declarations of the deceased, from the year 1802 until the year 1814, as to his intentions with respect to the disposition of his estate; and, also, his declarations as to the contents of certain former wills, to be given in evidence to the jury. And
3. Because the verdict was contrary to evidence.
Before we enter upon the consideration of any one of these reasons, however, it may be proper to take a little *748 notice of some objections raised by the defendant, which meet us at the very threshold, and which, if well founded, put an end to our inquiries.
He says there can be no new trial, after a trial at bar— in ejectment—by a special jury—and a verdict for the defendant—where there is evidence on both sides.
It is true, that before th^ doctrine of new trials was well settled, we find sayings in the books which seem to countenance every one of these objections. But since the case of Bright, executor of Crips v. Eynon, (Bur. 395) that doctrine is placed upon a more certain basis, and, is governed by more clear and rational principles. Lord Mansfield, in that case, traces'the doctrine to its origin ; shews that it necessarily became the substitute of the ancient writ of attaint; and that, without it, the trial by jury, at this day, could not exist, or existing, could not subserve the great purposes of distributive justice. Pie shews, too, that a new trial is quite as reasonable after a trial at bar as at Nisi Prius, and, indeed, more só, and that it is just as necessary in actions of ejectment as in other actions. In the case of Goodtitle v. Clayton, (Bur. 2224) he tells us the old objection against granting new trials in ejectment, because another action may be brought, had been overruled again and again. And, indeed, what is there in it? Would the defendant gain by putting the plaintiff to a new ejectment ? or, would he be placed in a better situation ? Would his expenses be less, or his possession sooner quieted ? Certainly *not. If the justice of the case, therefore, requires a reconsideration, the court will never prevent it by loading it with unnecessary costs, or protracting it by unnecessary delays. The true rule upon this subject, as it is now settled, is this: that when justice has not been done, in the opinion of the court, in one trial, the party is entitled to another, and, under special circumstances, the court will grant a third, (a) This is so *749 well settled, that it has been laid down by sir William Black-stone, himself, as a maxim in the law.
It has not been unusual, indeed, for popular declaimers, and, sometimes, as if to overawe the judges, to deny this exercise of power, in the courts, as an assumed power, encroaching upon the prerogative of jurors, and striking at the very root of the trial by jury, itself. But when it shall be considered, that it is a principle interwoven with the very texture of our juridical system, that the verdict of a jury shall not be absolutely conclusive, but shall be liable to be inquired of, in some form or other ; when it shall be considered, that in the earlier periods of its history, this was done by an attaint against the jurors themselves, for their false verdict, in which they were personally responsible, and that too, as it often happened, where the error was of mistake only, and not of design; and when it shall be considered, further, that the doctrine of new trial, as now established, has, in modern times, been substituted in the place of this more severe remedy, merely for the easement of the jurors, and the attainment of justice ; such declamation will be wholly lost, not only upon the court, but also upon the populace, whose passions it is intended to excite.
Pursuing his objections, however, the defendant, with some degree of triumph, has said that no judge, on earth, has ever granted a new trial, under all the circumstances above stated. Let us see.
The case of Wood v. Gunstow, (Styles 462-6) the first case of a new trial which we have on record, was after a trial at bar. The case of Musgrove v. The Mayor of Appleby, (Ld. Raym. 1358) was a trial at bar, and a new trial was granted though there was evidence on both sides, because the verdict was contrary to the opinion of the court. The case of Tilley v. Roberts, cited in the above case, was a trial at bar, upon the issue compos vel non, the very question here, and a new trial was granted upon the fact, though there was evidence on both sides. In the case of Smith *v. Parkhurst, (Strange 1105) it is said where the verdict is against evidence, the trial at bar makes no difference. The case of Goodtitle v. Clayton, cited above, was a case in ejectment, tried, at bar, by a special jury, and yet a new trial *750 was granted, because the verdict was contrary to evidence. The case of Den, ex dem., Chew v. Driver, (Coxe 166) in this court, was an ejectment by a special jury, and a verdict for the defendant, and. yet a new trial was ordered; and the case of Den, ex dem., Snedecker v. Allen, (Pen. 35) in this court also, was in the same circumstances.
We find cases then, in which new trials have been granted, in all the circumstances stated, individually, and some of them comprising many of them together, and though we should not find one which comprises them all, yet that, of itself, affords no conclusion in favour of the defendant. We' dispose of these objections then, as having no foundation in the law, and proceed to consider the reasons assigned, by the plaintiffs, for setting aside the verdict.
1. And first. Because the court admitted the witness, Abigail Coulter, to be sworn without interrogating her, as to her knowledge of the nature and obligation of an oath.
To be a witness’ is a personal privilege, or shall I not rather say, it is one of the distinguishing rights of a free citizen. Not only parties litigant, but the witness himself also, has a deep interest in preserving it entire. This ri^ht, therefore, cannot be impugned, interrupted, or taken away,.unless for lawful causes, and by lawful means. These causes, so far as they are personal, or go to the capacity of the witness, are principally these three; the want of discretion, as in the case of infants; the want of intellectual powers, as in the case of idiots, lunatics and madmen; and the want of -religious principle and belief, as in the case of those who do not believe in the being, perfections and providence of God, nor in a future state of rewards and punishments, where he that beareth false witness,, and so taketh the name of his God in vain, shall not be held guiltless, (a)
Upon the allegation of any one of these causes, when the witness comes to the book, the truth of the fact must first be tried, and then the judgment of the law be pro *751 nounced upon it. As to the mode of this trial, I have not been able to find any tiling very satisfactory upon it, by way of direct decision. So far as I can collect, however, and so far as I can reduce the thing to principle, the trial, which must always be by the judges, is, in the two first cases, by inspection only, upon the general principle that infancy and idiocy are triable by inspection; and, in the last, always by witnesses. In the two first, the judges inspect by putting interrogatories, in order to discover, not only the fact, but also the degree of indiscretion or of intellectual deficiency, and admit or reject the witness according as that is found, for infancy and lunacy are not absolute bars; but in the last case, that is, the case of infidelity, if the fact be found, the bar is absolute.
But the case before us, comes within no one of these. The witness is of the age of sixteen years, brought up in a Christian country, and in a Christian family. She has, therefore, in her favour, not only the common presumption, hut also a special presumption arising from her manner of education ; and, therefore, there could be no more reason for interrogating her than any other witness. The question then presents itself; is the court under obligation to interrogate every witness whom the party may think fit thus to challenge, of whatever age, and under whatever circumstances ? I have been able to find nothing in the books to countenance such a position, unless it be some cases of late years (and of no authority here) at the Old Bailey, in England, where the very oifscourings of society are frequently brought up as witnesses, and the judges, therefore, seem to take considerable latitude; and even these cases are so loosely reported, that nothing certain can be collected from them. The position, therefore, that the court is obliged to interrogate every witness to whom objection may he made, is thought to be too broad, and altogether inadmissible as a rule of practice. It is nevertheless true, that if one, even without any positive disbelief, and though he should be of full age, and possess the rational powers common to man, should, notwithstanding, be so ignorant as to have no just conceptions of The nature of an oath, and of the *752 obligations and penalties which it imposes, he would be ■inadmissible as a witness. But then the fact must be proved aliunde, for it is not matter triable by inspection, nor can he be examined to impeach his own absolute rights; and still less can he be examined on oath, for the very objection is, that he has not such knowledge of the nature of an oath as to render it in any way obligatory upon him. No such proof aliunde was offered here; and therefore, upon the whole view of the case, it is thought that this witness was properly admitted to the book.
*But even if it were otherwise, it would be no ground for a new trial, under existing circumstances, for, in the course of the examination, she disclosed the fact that she had been taught to read the Bible, and usually attended the public worship in a Christian church; after which the court would never grant a new trial upon the presumption of her ignorance.
2. Secondly. As to the admissions of the declarations of the deceased, with respect to his intentions in.the disposition of his property, and his declarations with respect to the contents of his former wills, (a)
It had come out, in the course of the trial, that the defendant lived with his father, in his house; that he had him, in some degree, under his care and subject to his control; and it had also come out that there had subsisted a friendly intercourse between the deceased and his daughters, so that no reason could be assigned why he should disinherit them in favour of their brother; and to rebut or do away the force of these circumstances this testimony was admitted. And though I was then satisfied with it, in the light in which it was placed, yet, *753 upon a careful review of the whole matter, I now think the admission of it was inconsistent with principle. If we consider i he thing carefully, we shall find that these circumsiances are not peculiar to this case, but precisely such as must necessarily attend most cases turning upon the capacity of the testator. A man, enfeebled by age or disease, must always be under the. care, protection, and government of somebody ; this somebody must generally be one of his children, who lives with him in his house, who administers to his wants and his wishes, who has the direction of his affairs, who aids him in this last solemn duty, and who will, almost necessarily be one of the objects of his bounty ; and though there may exist the purest parental affection and filial duty between him and his other children, this one will generally be preferred in the distribution of his estate, and that too upon the soundest principles of equity and justice. But as circumstances like these can never be made the ground of impeaching the will for the incapacity of the testator, so neither can they, when so impeached, be made the ground of admitting testimony to support it, which would otherwise be unlawful. For why break down settled principles and let in testimony to obviate circumstances, in themselves lawful and necessary, and which prove neither Ids capacity or incapacity.
^Besides. The plaintiffs did not put themselves upon these circumstances. They did not take the ground that the defendant had deceived his father ; that he had imposed upon him one will when he thought he was signing another, or that he had overawed him by fear or circumvented him by cunning, in this matter; and much less, that the injustice of the will vras a proof of the incapacity of the testator. They placed themselves upon the position, and adduced testimony to prove that the deceased, by the immediate visitation of God, had been rendered, in a very groat degree, incapable of physical, and wholly incapable of moral, action. They did not rest upon the ground that he had become weak, through the infirmity of old age; that his memory had thereby become treacherous and his judgment impaired; but that by this afflictive dispensation from heaven, he had become, at once, *754 totally and absolutely disabled and prostrated, both in body and mind; that he merely breathed; but that, as to almost every thing else, he was like a dead man. This was the position taken, and to establish this, was all their principal testimony directed. The plaintiffs, then, having taken this ground and placed themselves upon this single point, they were at liberty to give evidence of no fact inconsistent with it; this point they were obliged to maintain, and the defendant must meet them there, and stand or fall in the conflict. As rebutting testimony, then, in which light, alone, this was admitted, it appears to me now to have been improper, because there was nothing to rebut; the plaintiffs had given no testimony, they could lawfully give no testimony, to which it could apply as a rebutter. And the loose sayings of witnesses, unsought for by the plaintiffs, or relating only to the testimony offered by the defendant, which may seem to go .beyond this point, even if such could be found, could make no difference.
This, too, seems to have been the understanding of the defendant himself. He did not offer this testimony as admissible, under the particular circumstances of this case only, or with a view to obviate the inferences which might be drawn from them ; he insisted, before the court, and maintained, before the jury also, that the testimony was lawful, not as rebutting testimony, but upon the most broad and general principles; that the settled design of the testator, which it was intended to prove, ought, upon the rules of right reason,'to be received as confirmatory of the *will, and as superseding the necessity of proving that clear discretion, and that full exercise of the mental powers, at the time of the execution of it, which might otherwise be required ; in short, that the previous declarations of the testator, respecting his testamentary dispositions, at any period, how remote soever, may always be given in evidence to support his will. The court not being able, at that time, to accede to this doctrine in the full extent in which it was laid down, themselves raised this distinction in favour of this particular case, founded upon its peculiar circumstances, and, upon that distinction, admitted the testimony. But if there be no ground *755 for such distinction, if the circumstances upon which it was raised be precisely the same as must accompany all cases where this question is made, if the plaintiffs did not rest upon these circumstances to invalidate the will, but placed themselves wholly upon another point; and if even the defendant himself raised no such distinction, then we may safely lay it out of the case, and consider the question upon the broad ground upon which the defendant has placed it. In this view it was not new to me on the trial. It had been raised more than once at the circuits, and, therefore, had become the object of my attention, not only there but afterwards, in my chambers, upon the review' of what had been done. I had always negatived it in court, and, upon the review, had been more than satisfied that I had done so. If a question could be raised upon the intention in the will, this sort of testimony might, wfith more plausibility, be offered to explain and fix that intention. And yet, even there, little regard is paid, either by courts of law or courts of equity, to the declarations of the testator, either before or after the making of his wills, because possibly they might be made by him on purpose to disguise what he was doing, to keep the family quiet, to procure good treatment from those who lived with him, in his house, or for other secret motives, which after his death cannot be discovered. This doctrine is settled in lord Falkland’s case. 2 Vernon 337, 625. But if such declarations cannot be received, to explain a doubt arising upon a will which is admitted to be authentic, how much less can they be received to set up and establish a will, the authenticity of which is the very matter in dispute ? If because the deceased, in his better days, declared he intended to give this plantation to his son, the jury could lawfully draw the conclusion that he wras of sound and disposing mind and memory *when he executed the will, then the evidence was lawful, but if not, it could only tend to lead them astray. Now how a declaration of such intention, made ten years ago, can afford ground for such a conclusion, howr it can prove, or at all strengthen the belief, that one is of sound and disposing mind and memory now, is incomprehensible to me. And without such sound and disposing mind and *756 memory now, reason teaches, and the statute declares, the testament is void. To supply the want of mental capacity, or to make up its imperfection, by substituting in its place previous intention, would put it in the power of those about the bed of the dying to dispose of his property, in almost every instance. Most men, towards the close of life, speak upon this subject; they express, to their confidential friends, their views and intentions; they speak of particular advancements and bequests, sometimes seriously and sometimes not, sometimes with intent to make them and sometimes not, and always liable to change; and yet it would be but to get up a will'embracing the objects thus declared, or some of them, merety to give colour to the fraud, and the whole estate is gone. It would be but to prove declarations of previous intention, of settled design, and a will, in some respects, corresponding with such design, and it is no great matter whether the deceased had his senses or not.
But this will not do. Let us, for a moment, reverse the position. Let us say, that declarations of this kind may be given in evidence, to impugn, or destroy a will, and where will it lead us. A man’s views and circumstances change; the situation and condition of his family change. What he intended to do, and what it would have been most proper for him to do, twenty years ago, may be just the reverse now. Shall we then be at liberty to rake up, and present to a jury, all the declarations he ever made, in order to overturn a will, executed in the decline of life ; when, perhaps, the feebleness of old age, may give colour to the pretence, that he was incapable of such a transaction ? It will not, I think, be pretended.
If the doctrine contended for by the defendant, were really the doctrine of the law, the principle itself is so important, and the cases to which it is applicable, must necessarily have been so numerous, since the statute of wills, that we might well have expected to see it settled by a course of decision. ■ Instead of this, so often as the question has been raised before me, Hudson’s *case, reported in Skinner, (a book of itself of no great authority) has been the only one relied upon to support it. And to that one it has been answered, and I think satisfactorily, *757 that the evidence there was not objected to ; that there was no decision concerning it; and that the court, in determining the case, did not put their opinion upon it. And upon this trial, the counsel for the defendant, no doubt, because tliey were sensible it could not support them, did not even cite that case. The only authority which they did cite, was, two cases from Pennsylvania; one of which, in my judgment, docs not apply, because the declarations there proved, were so near to the time of the execution of the will, as to be connected with it, and to make a part of the transaction; they elucidated the state of mind of the testator, at the time ; and as to the other, it is not reported with sufficient accuracy, to see its direct bearing. Besides, it is well known that the people of Pennsylvania have a jurisprudence of their own, probably imposed upon them, at first, by the imperfection of their juridical system, which would but illy comport with the great principles of the common law, by which we are governed. Certain it is, that if we were to take up the decisions of all the states, founded, as they are, upon local customs, colonial necessities, and legislative innovations, and attempt to make them the ruie of adjudication here, we should not only disfigure, and break down the ancient temple of justice, in which we so much glory, but pile up in its place, a mass of broken fragments, without symmetry, form, or beauty.
But there is still another view of this subject. There w'as a discrimination raised by the plaintiffs at the trial, and it is still insisted upon in this argument, between the testator’s declarations, as to his intentions, and his declarations, as to the contents of his former wills ; and it was said, that even if the former should be admitted, there could be no pretence for the admission of the latter; that these wills had been proved to have been in the possession of the defendant himself, and that therefore, being neither produced nor accounted for, their contents could not be given in evidence in his favour. Inasmuch, however, as the defendant, at the time of this discussion, had set up no pretence of founding a title to the lands, upon these old wills, and had offered to prove tire declarations of his father, touching their contents, for the purpose of further *758 confirming his uniform and settled design only, no essen-tial difference was then seen, between the two parts of *this testimony; and, therefore, the latter was admitted as well as the former. This was certainly contrary to the rules of evidence. These wills had been proved to be in the possession of the defendant, by his own daughter; the contents of them, therefore, could not be proved in his favour, until he had accounted for the papers themselves. And how dangerous it is to depart from these settled rules, on any specious distinctions, not found in the books, is very manifest from this case; for the execution of the will of 1814, having been before proved, by one of the subscribing witnesses thereto, and the contents of it, as to this plantation, being now proved by the declarations of the deceased, and by these declarations only, the defendant, probably distrusting his own proof of the will in question, resorted to that of 1814, and maintained, before the jury, that if the former had not been satisfactorily proved, he was still entitled to the land under the latter. Now, that the will of 1814, whether admissible as evidence of previous design, or not, could not, under the circumstances stated, be admitted as lawful evidence of title in the defendant, or in other words, as an instrument that could convey the land to him, is a position too clear to admit of argument. And yet, upon which of these wills the verdict was really founded, remains altogether doubtful, especially if we consider the manner in which it was urged, and the great credit of the counsel who put himself upon it. It was, perhaps, most natural for men not much acquainted with legal niceties and distinctions, upon this evidence having been admitted as lawful, to place their verdict upon the will, concerning the execution of which there was no doubt.
Upon each of these views of the subject, now that we see the whole bearing of it, I think the admission of this testimony, touching the declarations of the deceased, as to his intentions, in the disposition of his property, and as to the contents of his former wills, was unlawful, and that the probability is, that the verdict was wholly founded upon it.
*759 8. In the third place. Because the verdict was contrary to the evidence.
After the plaintiffs had closed that part of the evidence, which goes to establish the incapacity of the deceased, the defendant introduced testimony to prove these three things ; first, that the deceased, for a number of years before his death, had had an intention to give this land to his son, and that he had actually car*ried this intention into effect, in his wills of 1809 and 1814; secondly, that Phebe Stevens, one of the plaintiff’s, had purloined these wills; and thirdly, that the deceased, at the time of the execution of the will now in question, notwithstanding what had been said to the contrary, was of sound and disposing mind and memory. Of the first part of this testimony, touching the deceased’s declarations as to his settled intentions, I have already spoken; in the second part, respecting the purloining of the wills, the defendant wholly failed, there being nothing in it to raise even the slightest suspicion, either against Phebe Stevens or her husband, who, it seems, had been accused, in turns, of this atrocious deed; and as to the third, to wit, the capacity of the deceased, it will require a more particular investigation, and is made the subject of the following observations.
In every action of human life, which proceeds from the understanding, and which requires the exercise of the intellectual powers of man, it is obvious, that the agent must necessarily possess that understanding and those powers, otherwise, the action, is not, properly speaking, his; he may, indeed, have performed the mechanical part of it, like amere machine, but the essential part, the direction of the mind, that which makes it the action of the man, is not there. That understanding, and those intellectual powers, which are necessary to enable a man to make a valid testament, have, in some books, usually been denominated a sound and disposing mind and memory. By these terms it has not been understood, that a testator must possess these qualities of the mind, in the highest degree, otherwise very few could make testaments at all • neither has it been understood, that he must possess them in as great a degree, as he may have formerly done; for even this, would disable most men, in the decline of life ; *760 the mind may have been, in some degree, debilitated, the - memory may have become, in some degree, enfeebled; and yet there may be enough left, clearly to discern, and discreetly to judge, of all those things, and all those circumstances, which enter into the nature of a rational, fair, and just testament; but if they have so far failed, as that these cannot be discerned and judged of, then he cannot be said to be of sound and disposing mind and memory■ (a)
The language of our statute concerning wills, differs a little from the language of the books. It does not use the words sound *and disposing mind and memory, at all; but it declares, that wills, made by persons of nonsane mind and memory, shall not be good and effectual in the law. I do not perceive that there is any great difference between these two modes of expression. Sane (sanus) means whole, sound, in a'healthful state, and is applicable equally to the mind and to the body, (mens sana in corpore sano) but I believe it is applicable to nothing else, unless, perhaps, when it signifies wise, and then it is applicable to language or discourse. If sane, then, when applied to the mind, means whole, sound, in a healthful state, nonsane must mean not whole, not sound, not in a healthful state, that is, broken, impaired, shattered, infirm, weak, diseased, unable, either from nature or accident, to perform the rational functions common to man, upon the objects presented to it.
Now, the objects of a man, making his last will, are, his property, its nature, its various parts, and their relative value; if he is a father, his family, their conditions, necessities and merits; his own duties and obligations too, as a father, and their claims and expectations, as children; for all these aré founded in nature, and in every code of law, both human and divine. The mind which is incapable *761 of viewing, and in some good degree, of'comprehending, and combining these, and of forming some rational - judgment concerning them, is incompetent to dispose of property by last will. I have said in another case, and I now repeat it, that all those sayings to be found in the old books, about cornitvng ten, telling the day of the week, naming a friend, &c. (not to mention another instance of still more doubtful import) as being sufficient evidence of testamentary capacity, are wholly out of the question at this day; they cannot have the smallest effect, they ought not to have the smallest effect, upon rational minds. Who ever saw a man, how insane soever, who ever saw even a bedlamite, who had once possessed the power of reason, and still possessed the power of speech, who could not do all this, and ten times more? And yet even these old books, extravagant as they are in this respect, tell us that mere monasyllabic answers, such as yes and no, to questions proposed by those about a dying bed, shall not be received as evidence of sound mind.
Let us see, then, what is the case here, and what the testimony. And in making this inquiry, let us admit, and I do most unequivocally admit, that every witness has declared the truth, *according to his impressions, and according to the best of his remembrance, at the time he declared it. Indeed, in the investigation which we are now making, it is necessary to do this. It will not do, when we are inquiring as to the weight of the evidence, to say the jury might have believed this witness, and disbelieved that one, and sanctify the verdict upon that ground. That would at all times totally preclude such inquiry, for there is no case so bald, as to have no witness in its favour. This, therefore, is not the principle. We are to take the whole testimony together, and if wre can, to discover its true import. Indeed, the disregarding of a whole range of witnesses on one side, whose credibility stands wholly unimpeached, and whose testimony can be reconciled with that of the other witnesses, is, in itself, a good cause for setting aside a ver- . diet, and reconsidering the cause. The facts attested, therefore, must be taken as established; the deduction from the facts, was the business of the jury; and upon *762 this motion, it is the duty of the court to see whether -that deduction has been lawful and just.
The deceased being a man far advanced in life, and already greatly debilitated, both in body aiid mind, was some time about the month of May, 1817, visited by a severe paralytic affection, which benumbed, or rather entirely destroyed, the powers of his right side ; and he was, thereupon, put to his bed, from which he never rose. He continued to lie in that situation, gradually declining with the progress of time, till towards the close of the month of August, when he departed this life. During this long confinement, he was visited by relations and friends and neighbours, of whom he had very many, and very respectable ; they visited him in the morning, in the afternoon, in the evening; they, together with those of his household, watched with him at night, administered to his wants and his comforts, fed him, turned him, raised him, shifted him like a perfect infant. He never asked for food, either by words or signs, he never refused it, he never said he had enough, he never rejected it, he took no concern about, nor had any regard to, even the necessities and functions of nature. During all this time (except so far as I shall hereafter mention) he never spoke, he gave no intelligible signs of understanding or volition, only that with his left hand, he would sometimes take the hand of a visitor, and seem to draw it towards himself; but whether he could distinguish persons, or recognize the countenance of friends and neighbours, could not be known, for he could discover it neither by words nor actions. Some of them, indeed, one or two, I believe, imagined that he recognized and distinguished them, but even they admit it was imagination only. He could hear, in some degree, for he seemed to notice the sound of the voice; he had the power of raising his eyes, but he raised them in a wild, unfixed stare, which gave but little sign of intelligence, nay, rather, as some of the witnesses say, of a total want of it. When the minister of religion, in whose cure he was, called to visit him, he spoke to him, but he did not answer ; he prayed with him, but he did not un-' derstand; he opened to him his duties and his hopes, but he gave no assent, except that at one time he thought he *763 perceived an inclination of tlie head; and though this holy man seemed to think that this pastoral visit, this devotional exercise, and this consolatory advice, might have been soothing and refreshing to his soul, yet this inclination of the head, was the only sign from which it could be collected, and even of that he was in some degree doubtful. The testimony of all the witnesses, (except what shall hereafter be mentioned) concurs in establishing these facts, in proving this to have been the situation of the deceased, from the time he was taken till the day of the making of this will, a period of ten weeks and more. And building their judgment upon these facts, and drawing their conclusions frcm this situation, they all concur, the clergyman excepted, in saying that he did not possess testamentary discretion, and powers of mind.
1 have said, that to the concurrence of the testimony of the witnesses, as to the facts above stated, there were some exceptions. John Phares, one of the subcribing witnesses, deposes that the deceased did frequently call him by name, he does not say during this illness, but it is to be presumed he so intended ; he further deposes, that within four or five weeks before the making of the will, when he called to see him, the deceased asked him many questions, principally about his family, and about a dispute which existed between him and his neighbour, concerning a division line of their lands, which last, by the by, was a strange proof of sanity in a man in his situation. Mrs. Phares, also, another subscribing witness, says, that during this malady, the deceased could speak, that he knew her, even in the night-time, and spoke to her, but she does not relate to what *extent he spoke, about what, or what he said. Charity Smith, I think a very aged and very respectable lady, a near relation of the defendant’s wife, and also Mary Vancleve, the defendant’s daughter, say, that during this period, the deceased did speak, so that he could be understood by them, but to what amount, or to what effect, particularly, they do not say. Now, however difficult it may be to reconcile what these witnesses say on this matter, with the rest of the testimony, and with the condition of the deceased, as it appeared *764 to others, yet, as they are persons of irreproachable -character, and have sworn it, it must be admitted, that he had some knowledge of those continually with him, and could distinguish one from another; that he had some sort of articulation, and could utter some words, at least, so as to be understood by those around him. And this, I believe, is all they have sworn.
Let us take the condition of the deceased, then, up till the morning of the making of the will, to be varied so far from that given by the other witnesses, as this testimony necessarily varies it; that is to say, let us take it that he could and did distinguish one from another of his family, that he could and did speak, and articulate some words, and ask some questions, such as are stated, so that those around him could understand him; and in what situation still do we contemplate him. The powers of vision and articulation are mere organic powers, they are wholly distinct from the mind, and unless it could be shewn that the images presented by the one, were justly received and compared by the intellectual faculty, and that the words uttered by the other, were expressive of the result of ^uch comparison, they are no proof of sanity. Does the mere power of distinguishing persons, does the mere power of uttering indistinct and inarticulate sounds, constitute, or at all prove, a testamentary capacity ? Is every man capable of making a will; can every man be presumed to be of sound mind and memory, who can do this? Certainly idiots, lunatics, and madmen, can do it; persons in the raging of a fever, in the last stages of lingering disease, can do all this; when the mind can neither recollect, compare, nor judge; nay, may we not say, with truth, that until death, by his near approach, has closed the eyes, and sealed the lips, every one can do this; and yet every one is not of sound and disposing mind and memory. The possession of these powers, then af*ford no argument against the conclusion which so irresistibly forces itself upon us, from the whole course of the testimony.
But the situation of the deceased at the time of the signing of this paper, is not so favourable as even this would make it, for on that morning he has become worse, *765 his daughter-in-law is alarmed, she thinks him greatly altered, and near his end, she calls in neighbours, he is-in a clammy sweat, his hands and feet are cold, he utters not a word, in the opinion of the family, the hand of death is upon him.
In this situation, and at this time, and not till this time, the grand discovery is made; the will is lost; the rough draft is produced; the execution of it, as a will5 proceeds. What part does the deceased bear in the transaction? Does he inquire for the old will, to know whether it is safe? Does he call for this draft to be executed in its place? or, when produced does he desire it to be read to him, to know its contents ? Does he send for witnesses to attest the execution of it, or intimate to them, when they come, what is to be done ? Does he do any one act or thing, or utter a single word which indicates that he has any knowledge, himself, of what is to be done ? Not one. And yet it is said he can speak. Well! let us hear him. It is announced to him that the will is lost; he says, who, who. The rough draft is read; he is asked if he understands it well? he says yes, well. He is asked whether it is a copy of his old will ? he says yes; whether he will sign it? he says yes; he is raised in the bed, the pen is put into his left hand, he is asked, whether Mr. Phares shall steady it? he says yes; Mr. Phares takes his hand, the name is written, manifestly, by Mr. Phares, himself, as the agent, for no man, in that weak condition, with his left hand, could write as that is written; he is told he must put his -hand upon it, and acknowledge it to be his last will and testament; with some help he extends his loft hand, which is laid upon the paper, and being asked, whether it is his last will and testament? he says yes; according to Mr. Phares, he says, last will and testament; according to Mrs. Phares, and according to Johnson, who seems to be a more thorough going witness, and none of your monasyllabic fellows; he says, I acknowledge this to be my last will and testament. He then takes the hand of Mr. Phares and silently presses it; he utters not a word; he is laid upon his pillow; he never speaks again, but in a few days expires.
*This is the substance of the testimony, as to the fact, *766 upon this point, comprising every material part of it, "and presenting it in its simplest form, so far as I am capable of that office.
The subscribing witnesses it is true, on the trial, testify in the most full and unequivocal terms, that they believe the deceased, at the time of the transaction, to have been in the possession of his reasonable faculties, and to have understood very well every thing that was proposed to him, touching the will. Two of them, however, Mr. Phares ■ and Johnson, did not so express themselves, immediately, that is to say, a day or two after the transaction, but they expressed directly the contrary ; they declared within a few days after, at sundry times and places and to sundry persons, that they did not think him capable of making a will, and that the will could not stand, or words to that effect. This contradiction, however, does not necessarily imply the smallest degree of turpitude of dereliction of the truth, on their part. Facts, and circumstances, and impressions, in which we are not interested, soon become obliterated from the memory. In the situation of Mr. Phares, who was, himself, a dying man, who had concerns of infinite moment to occup3r every power of the soul, this was especially to be expected. And as to Johnson, he was a way-faring man, a total stranger to all the parties and all their concerns, called in as a witness, merely to fulfil the requisitions of the law; there can, therefore, be no great claim upon his memor}7 further than merety to attest his signature; and certainly there can be no great reliance upon his opinion, as to the mental capacity of the deceased, whom he had before never seen, of whom he had never heard, and in whose chamber he then was but during the few minutes occupied by this transaction. This belief, then, which these men express, being an after-belief, wrought up long since, and not the immediate impression, not the deduction from facts at the time, hotvever honestly declared now, can have but little weight in the scales-by which truth and justice a,re weighed.
The whole, then, as to matter of opinion, seems to rest pretty much upon the testimony of Mrs. Phares, the other subscribing witness. She is an old lady of very respectable character; her integrity and truth are not to be doubted. *767 She was, on the morning of the transaction called in by the defendant’s wife, who told *her she thought the deceased was greatly altered, and near his end, and that she did not like to be alone with him. She went in and found him lying as if asleep, and his extremities cold ; he took no notice of her entrance, nor did bespeak to her, nor she to him. Soon after this, (about half an hour, as nearly as I could collect) in the presence of herself, her husband, and Johnson, the defendant announces to him that the will is lost, upon which he seemed to rouse up as from sleep, and then the execution of this paper proceeds as before stated; and from these facts and circumstances she formed the opinion which she now expresses. Now although it is certainly not impossible that the deceased may, by omnipotent pow'er. have been raised for a moment, as it were, for this very purpose ; yet that the opinion of this old lady, founded upon these facts, at the same time so differently construed by the other witnesses, however satisfactory to her own mind that opinion may be, I say that this opinion, thus formed, should be received as conclusive evidence of so wonderful an interposition, can hardly bo admitted.
I shall proceed no farther, I shall make no further comment. If I have rightly comprehended the evidence, if I have rightly stated the case, they speak for themselves.
If the jury have placed their verdict upon the sanitty of the testator, which is the only real question in the case, they have, in my opinion, found a verdict contrary to the great weight of the evidence; if they have placed it either upon the will of 1814, or upon the previous intentions of the testator, they have found a verdict contrary to law.
After a trial so laborious, so expensive, before a jury so upright, so intelligent, so discerning, selected for the very purpose, it is with great reluctance as well as with great diffidence, that I have brought myself to this conclusion. But yet, upon the most careful review of the whole case, I am constrained to say, that I think the court was mistaken in the admission of evidence ; that I, myself was both mistaken and deficient in not giving the whole properly in charge to the jury, and that the jury was mistaken, either as to the construction of the testimony, or *768 the point upon which they placed their verdict. And for -these causes, in my judgment,
The rule for setting aside the verdict must be made absolute.
*Rossell J.
The plaintiff, in this case, applies for a new trial. 1. Because the court admitted unlawful testimony : viz. 1. The repeated declarations of Benjamin Vancieve, the testator, from 1809 to 1814, respecting his original intention to leave the premises in question to his son, the present defendant, and that by two wills of the above dates ; thereby giving parol testimony of their contents without accounting for the non-production of the said wills.
2. The court refused to permit a witness, on the part of the defendant, to be examined touching her knowledge of the nature and obligation of an oath, although she was only sixteen years of age, bound by indenture, to the defendant, by the overseers of the poor, and had never, as the plaintiff alleges, been sworn as a witness.
3. The verdict was against the charge of the court.
4. The verdict was against the evidence given in the cause.
The two first reasons given by the plaintiff I have, from their intimate connexion, included in one ; and shall observe, that as the defendant did not claim the premises in question, under either of the wills of 1809 or 1814, but under the one given in evidence of 1817 : and as the testimony relating the different conversations of old Mr. Vancieve, neither went to establish or cancel either of the first mentioned wills, I cannot perceive any legal objections to the evidence. The will of 1817, if proved in due form of law, was, after his decease, a complete revocation of all the clauses and provisions of any previous will or wills; and there could not, then, be any obligation on the defendant to account for their non-production, at the trial, in any other mode than by producing the last will of the testator, by which, in legal contemplation, they were can-celled or destroyed. It was urged, on the argument of the present question, that this testimony was irrelevant to the point in issue. I cannot view it in this light. The *769 true question, before the court, was the sanity or insanity of the testator. After the subscribing witnesses to the will - had fully proved its execution, in the maimer established by law ; the plaintiffs, to prove the incompetency of the testator, gave in evidence, the words, behaviour, sickness, and almost infant imbecility of mind and body of the testator, not only immediately before and after the execution of the will before the court, but for years previous to that time; together with many circumstances and observations *ealculated to induce the court and jury to believe that thetestator was treated unkindly by the defendant; was afraid of him, and under his control; by reason of which the present will was fraudulently imposed on him, for the purpose of géüiiig the real estate of his father, for his own benefit, to the exclusion of the other heirs at law. To rebut and overcome the force of these strong charges, was not only the legal right of the defendant, if in his power so to do, but a necessary and important duty. One of the great distinguishing marks of insanity, is the total change of mind, feelings, affections, and inclinations of the afflicted object. Was it not competent, then, to shew that this strong trait of insanity could not be fastened on the testator? and could that be done more effectually than by shewing that the will, before the court, was not an imposition on the testator, causing him to alter the disposition of his estate ? But, on the contrary, that for many years, when no charge of any imbecility of mind or body could attach to him, he had determined to dispose of his estate, in the manner set forth in this will; that he had previously declared this intention, from time to time, to his friends; nor did this long cherished determination leave him at the close of life ?
But if it is said, the mind of the testator was not, correctly speaking, so much deranged as lost, by the almost total extinction of the animal functions of the body, and could not act in the disposition of his estate, agreeably to that part of the charge of the Chief J ustice respecting the terms, sound of mind. I would observe, that I could by no means concur with the Chief Justice in his exposition of the term sound, as applied to the mind of the testator. Whole, unbroken, unchanged, by disease, age, or infirmity. *770 Few, indeed, would be the wills confirmed, if this is cor-rect. Mind and body make the man; the union of these is so closely linked that one cannot suffer materially without affecting the other. Pain, sickness, debility of body, from age or infirmity, would, according to its violence or duration, in a greater or less degree, break in upon, weaken, or derange the mind, and render it incapable of exercising its full powers, as in time of perfect health. Yet, I believe, none have ventured to pronounce, that extreme illness incapacitates a testator, or that old age, when memory was impaired andjudgmentweakened, rendered him incapable of disposing of his property. Of sound and disposing mind and memory, is the language .used. The sentence must be *taken together, not disjointed, and sound explained in its literal, distinct, and separate meaning, unconnected with the subject matter to which it necessarily and evidently refers. That this is the universal rule, is manifest from almost all the authorities contained in our books. Thus, taken in connexion, it means, that the testator, at the time of executing his will, had that soundness of mind and memory, enabling him to understand the nature of the instrument he signed and sealed, the relative situation of his family and connexions ; the general extent of the property disposed of; and that it was so disposed of, as was agreeable to his desire. • In the present case, however debilitated and reduced in mind and body, old Mr. Vancleve might have been, when he executed the will in question; three, witnesses have solemnly sworn, that he was in possession of this necessary soundness of mind and memory; two of them, his near neighbours, in the habits of intimate acquaintance and frequent communication with him, in sickness and in health; and beyond, even an expressed doubt, capable of fully understanding the nature of the oath administered to them, and without a whispered suspicion of the integrity of their hearts or characters. This testimony was also corroborated by that of several others, and the verdict of the jury has demonstrated that they believed them.
3. The court refused to suffer certain questions to be *771 put to a witness, respecting lier knowledge of the nature and obligation of an oath.
As to this reason, suppose the court in an error, I see but little in it. The testimony of this witness had but little, if any, bearing on the point in issue. It was confined to some collateral matter and declaredly of no importance, and it would be as novel as it would be a hard case, on the part of the defendant in ejectment, to deprive him of- the benefit of the verdict of a struck jury, so laboriously obtained at bar, for a reason as slight as this.
4 & 5. The verdict against the charge of the court, and against evidence. The first of these does not appear to be founded in fact. The Chief Justice, in charging the jury, gave an explanation of the necessary soundness of mind of a testator, to enable him legally to dispose of his estate, and left it to the jury, on the whole evidence, to say whether this will was executed by Benjamin Vancleve, when in possession of that important qualification of mind, or not. In the exercise of their constitutional powT*ers they have passed their verdict on this question. And, in a ease like the present, I am unwilling to disturb that verdict and change the situation of the parties. As evidence was given, by both parties, of the state of the testator’s mind, at and about the time of executing the will, it cannot be correctly called a verdict against evidence, as in the fourth reason. I am, therefore,- on the whole case, of opinion that the plaintiff should take nothing by his motion.
Southard J.
In the investigation which I have given to this motion, and the result at which I have arrived, I have not been governed by the objections, arising from the nature of the cause, and the place of trial, which were so strongly urged by the counsel for the defendant. That it was a trial at bar, in an ejectment, where the questions before the jury savoured much of a criminal charge, and where the verdict was for the defendant, are circumstances of weight, and have received the countenance of other courts, but do not, with me, afford conclusive reasons why a new trial should be refused. In a case where these circumstances were united, it should be *772 a clear violation of law and justice, which, should ensure the interference of the court. Yet, if such violation appear, we have the power, and are bound, to repair the wrong.
Before I attempt an examination of the reasons filed in support of this motion, I think it proper to admit, with the counsel for the plaintiff, the high importance of the power of granting new trials. It is a power necessary to the very existence of the trial by jury. But we must also remember, that it is only valuable when cautiously exercised. I also concede, that the title of an heir at law, is not to be defeated by conjecture or doubt, but by express and intelligible devise alone; (a) that a will executed with the statutory formalities, must be produced; that the testamentary capacity must be well established, especially where probate has not been granted; and that intentions, not executed, however frequently declared, will not avail. These are principles, about which, there ought to have been no discussion ; principles, which will not be violated, in the decision of this motion.
The first reason rests upon the refusal of the court, to interrogate Abigail Coulter, before she was swTorn, upon her knowledge respecting God; a future state; the nature and consequences of an oath; and her having before been sworn in court.
When she was offered as a witness, it appeared, that she was between sixteen and seventeen years old; that she had lived, a considerable time, as a bound servant, in a religious neighbourhood and family ; and that she had the appearance of ordinary intelligence. The court, therefore, declined to interrogate her, and I think rightly. Persons, after the age of fourteen, are, prima facie, competent witnesses. An inquiry into the extent of their capacity and knowledge, is matter of discretion irx the court, and ought not to be made, upon the mere suggestion of a party, who may seek the gratification of unfounded suspicion, or desire to throw contempt and imputation on a witness, who is feared. Some good reason, which renders the capacity or knowledge questionable, should always be required. In the present case, the *773 plaintiff doubtless sought, what he considered, a proper protection to himself, but he offered no fact, from which a well founded doubt of the capacity could arise. This being so, I think now, as I thought then, that no principle of fairness or law, required the court to interrogate her.
Besides, if the court were decidedly wrong, the verdict should not be disturbed. It afterwards appeared satisfactorily, that she possessed all the information requisite to justify her admission. And, moreover, her testimony was such as could not have governed the verdict. It must have been the same, without it, as it was with it.
2. The verdict was contrary to the charge of the court. I was not in court when the charge was delivered, and have had no such report of it as to enable me to decide, correctly, upon this reason. The charge has been represented as being hypothetical, so far as related to the facts ; supposing the jury to find certain facts, and stating the law as applicable to such finding. If this be so, we must determine the existence of the facts, before we can say that the verdict was contrary to the charge. We must determine where the weight of evidence lies; and this wTe shall be called on to consider, under another reason.
3. The court admitted unlawful evidence, viz. the declarations of the testator, and proof of the contents of certain wills, without producing them.
A correct understanding of this reason, can only be obtained *by reviewing the cause, so far as it had progressed, when the question respecting the admissibility of this evidence, arose.
The plaintiffs claimed title as the children and heirs of B. Vandeve; and having proved that they were so, rested. The defendant, who was also a son and heir of B. Vandeve, then produced a paper, purporting to be a ■will of said Vandeve, which, among other things, devised the premises in question to the defendant. The testamentary witnesses were all called, and unequivocally swore to the execution of the will, and the sanity of the testator, at the time of executing it. It was then read to the jury, as a will proved with legal formality. After this, *774 the plaintiffs opened to the court and jury, that they would prove, that the testator had long lived with the defendant, at his table, under his control, ill treated by, and in fear of, him; that he had long been, and at the execution of the pretended will, was, in a state of second childhood, totally incapable of mánaging his property, and destitute, altogether, of the legal testamentary' capacity ; and that under these circumstances, the defendant had fraudulently imposed upon him, and induced him to make the will, which was the mere contrivance of the defendant, and not the dictate of the testator’s sound mind. In support of this opening, they called many witnesses, who detailed a vast variety of facts and opinions, tending to substantiate it, and, as the plaintiffs did then, and do still, insist, completely substantiating every part of it.
After the plaintiffs had closed the evidence in support of this view of the case, the defendant proceeded to countervail it, by evidence of a like character ; and also offered to prove, that for many years before his death, the testator had declared his intention of giving this land to the defendant, and that he had executed two previous wills, to carry this intention into effect. This evidence was objected to, but admitted; and this admission gives rise to the present reason. And, before a more particular examination of it, it will be proper to remove out of our way, certain ideas and difficulties, which do not properly apply to it, but which were interposed in the course of the argument.
1. This evidence was not offered as proof of a will of Benjamin Vancleve, in order to carry the lands, nor to supply the absence of a written will. The law is satisfied with nothing short of a written will, executed with all the formalities prescribed in *the statute. No parol evidence can possibly supply its place. Nor did the court understand the defendant as offering it, with that view. He had presented a written will, in legal and competent form, and executed with due solemnities, provided the testator possessed a disposing mind'. It was in reference to that mind alone, and as rebutting the plaintiffs’ alie *775 gauous and proofs, that this evidence was offered and considered competent.
2. It was not to explain a written will. The will itself required no explanation : the evidence was calculated to afford none.
3. It was not designed to show, that less than the strict testamentary capacity, was sufficient to sustain this will ; but to prove that he really did possess that capacity ; and the question is, was it competent for this purpose, under the circumstances in which it was offered?
The technical issue was guilty or not guilty. The substantial issue was, will or no will. The point on which this issue rested, was the existence of the testamentary capacity. To this point both parties necessarily devoted their attention. Is it then competent, for a party, who has exhibited a written will, and proved its formal execution ; in support of the sanity of the testator, which is disputed, not only at the time of execution, but for years before; and in denial of the allegation of fraud in procuring it; to prove the designs of the testator while his intellect was unquestionable? To shew how he reasoned, and what he said on the subject of the devise ? I think it is ; and that it is one of the best modes by which a jury can acquire a proper knowledge of his capacity, and correctfy estimate the charge of imposition.
It is here to be recollected, that this question arose after the testamentary witnesses had all sworn to the mechanical execution of the will, and the testator’s assent to it. Did a sound mind accompany that assent? Did he speak what he meant ? Did he express the resolution which, in his soundest hour, he would have pronounced ? How shall we discover this ? I answer, let us ask his soundest hour, and most deliberate judgment, if we can find them. When the competency of a man, when his sanity, at a particular moment, is questioned, what more conclusive mode is there of ascertaining it, than by comparing what he then said and did, with what he said and did, at other periods of his life? If we find that he thought, and reasoned, and acted at that time, as he had for years before thought, and reasoned, *and acted, shall we not either admit his sanity at the moment, oi;deny his sanity *776 for years preceding? If he executes a purpose, which he resolved, for a considerable portion of his life, to execute, shall we not thence infer, that his intellect remained ?
The execution of a will, the distribution of an estate among a family, is an act of a peculiar character. It is not the prompt and unpremeditated effort of the moment, but the tardy effect of long observation on his family and property; on the claims of duty and the calls of affection. It is frequently the result of the combined reasoning and feelings of years; often meditated «on, often resolved, and not unfrequently divulged. When, then, it is said, that a testator did not know what he did, is it not, at least, one fair answer to say, that he did what he had always designed to do. That his mind operated, on this subject, as it had always before operated ? I say that it would be one fair answer. I do not say that it would be a conclusive answer ; nor do I say, that it is a kind of answer altogether free from suspicion, and not subject to be misrepresented. We are not here discussing the weight and conclusiveness, but the competency, of the evidence.
Let us, as was done by one of the counsel for the defendant, reverse this view. Suppose the capacity of a testator in question, and it is alleged, that he had been fraudulently imposed on, in a state, so weak and feeble, that he could not distinguish between right and wrong, or distribute his property discreetly, and it could be shewn that the devise was in direct contradiction to the dictates of justice; to the deliberate resolves of his judgment; to his warmest affections and the bitterest animosities of his heart, nurtured for years, and repeatedly and feelingly proclaimed. What would we say ? would we not infer that the devise was not his? that he had been imposed on? that he had not been himself? that he had not possessed sufficient mind, at the time, to recollect his family and estate; to reason; to dispose of his property with discretion ? And when the jury was called on to say whether he did possess such a mind, would we be justified in concealing this light from them? Would we not conceal that, which in the language of BlacJcstone, “ demonstrates, makes clear, and ascertains the truth of the very *777 fact or point in issue?” And in forming our opinion, we are not to forget, that the legality of evidence depends - always on the circumstances in which it is offered, and *the nature of the question or fact to which it is to be applied. When this is forgotten, technical rules serve only to bewilder and confound.
It seems to me, that the reasoning which has been opposed to the competency of this evidence, requires too large an admission upon two points. It seems to take for granted, that the testamentary witnesses did not swear to the truth, and that the testator did not assent to the execution of the will, nor, as they declare, perform the act of signing and acknowledging.
Now, this fact having been sworn to, the court cannot reject it, and the jury may believe it, and we are now merely to say, whether the declarations in question, are calculated and are proper to show, that, in performing the act, he knew what he did. And I cannot hesitate to say, that if the jury did believe the fact of execution, these declarations were proper guides in forming their estimate of the portion of intellect which accompanied it, and were not, in the language of the counsel, an ignis Jatuus calculated to lead them into error.
But it seems to me also, that this reasoning not only presumes that he did not execute the will, but, also, the very fact to be proved, that he was in a state of mental imbecility. The argument seems to be: you must not prove what he would have done, in his sound mind, in order to make that valid, which he did with an unsound mind.
But is it shewn that he had an unsound mind? Who shall determine this? Is it not the essence of the dispute ? And is it not proper to compare the efforts of his strength, with this act, to know whether they partake of the same character.
Again. This evidence was competent, as designed to rebut the charge of fraud and imposition, and this whether the charge was a separate and distinct allegation, or, as was argued, an incident to, and depending upon, the want of capacity in the testator. It was said, in opening the evidence, that the will was obtained by a fraudulent im *778 position upon the testator’s weakness ;■ that he was under -defendant’s control, and in fear of him; and some evidence was given designed to prove it. The allegation and proof then were, that testator was imposed on, and did not speak his own will. Was it not a proper answer, that he did what, for twenty years, he had intended to do, and therefore there could be no imposition ? And if this be a proper answer, shall not the defendant *be permitted to prove it ? and can it be proved in a better way than by the testator’s acts and declarations ? I am aware of none.
Without, therefore, calling in aid the argument, which was so fairly and forcibly pressed by one of the defendant’s counsel, that these declarations were competent, because they were the declarations of the ancestor, respecting the heirs and the inheritance, I feel prepared to say that they were clearly admissible, for the reasons which I have endeavoured to assign.
But, únder this reason, it is further urged, that the court erred in admitting proof of the contents of certain wills, without their being produced. This objection was not pressed, nor noticed, at the trial, and therefore deserves less countenance, if it should be at all heard. 10 John. 7. 3 Bur. 1253. But it does not seem, to me, to have weight, for two reasons. 1. The contents of these wills were not shewn, in order to make a title under them, as valid and existing wills. The defendant’s claim shewed that they were destroyed in law, if not in fact. The making of the last will, under which he claimed, put an end to them. The legitimate object of speaking of them, was to indicate the temper and intentions of the testator, as to his children and pro^rty; to strengthen the inference that, in his last days, he recollected and executed the purposes of his past life. 2. The evidence of these contents, was not by any person who had seen them, and could prove their contents, as lost papers. They were proved by the testator’s own declarations, and thus, stand precisely in the same situation as the evidence which is considered under the first part of this reason. Besides, if additional causes were wanting, to justify this evidence, it is found in the testimony of Cast *779 ner ; the proof of affection between the testator and his daughters; and the deposition of Andrew Reeder, offered,; by the plaintiff. This deposition contains proof of the existence of the will of 1814, and an account of its contents ; and seems to me, therefore, to legalize the subsequent evidence of the defendant, respecting them.
4. The last reason, upon which much argument was expended, is, that the verdict is against the weight of the evidence.
In looking into this reason, I find no difficulty arising from any difference of opinion, respecting the nature of the testamentary capacity. The character of that capacity has, on former occasions, been laid down by this court, {South. 454) and I feel no disposition, in this case, to weaken the strength of the terms in *which it was done. He who claims lands, under a will, must shew that the testator executed it, with due forms, and that he possessed a sound and disposing mind and memory ; a mind and memory, having a capacity to remember and discreetly to dispose of his property; and to recollect, discern, and feel, the relations, connexions, and obligationsj of family and blood. The question here is, did that capacity exist ? The verdict answers in the affirmative. Is that verdict against the weight of the evidence ?
I shall not here stop, to give a detail of the evidence. It is, perhaps, to be regretted, that my apprehension of it, is, in many respects, variant from that expressed by the Chief Justice. I certainly did not understand the witnesses as he has done. But the view which I take of the point now under consideration, renders a full statement of the evidence unnecessary, to an explanation of my opinion.
This question always presents difficulties to my mind. The first and highest duty of the jury, is to weigh the evidence. This is its peculiar province, and one which will never be hastily invaded by the judge, who regards the trial by jury, as one of the proudest features in our juridical system. It has been elsewhere well said, “ the credibility of witnesses is the peculmm of the jury. Take that away, and what is there left.” South. 46. Yet still, if it be perfectly clear to a dispassionate court, that the jury, *780 through partiality or prejudice, have grossly disregarded \|he evidence, reason and the authorities require, that the verdict should be set aside; both to preserve the system pure, and to administer justice to the parties. The difficulty is, to find the point to which the court ought to go, in questioning the correctness of the jury in this matter; within what bounds the decision of the jury shall be irreversible; to establish that line, quam ultra, (Atraque, nequit consisten rectum; so as not, on the one hand, to trespass on the rights of the jury, and, on the other, not to permit injustice to be done. The judges have no authority, nicely to weigh the evidence in theii* own scales, and resolve that the one side, by so much, overbalances the other; that this witness was, in some degree, more worthy of credit than that; that this shall be accepted as convincing and satisfactory, and that rejected. As little right have the jury, lightly to sport with the evidence, which the law affords, and the credibility of the witnesses.
Where opposing and contradictory evidence has been given, *1 am aware of no safer rule, than to take that exhibited by the party, in whose favour the verdict is rendered; examine it by itself, and if it be of such character and amount, as uncontradicted, fully, fairly, and completely, to justify the conclusions of the jury; then, to let the verdict stand. The jury may have disbelieved the opposing testimony; and they are to determine whether they will disbelieve it. But if the evidence in favour of the verdict, leaves it all questionable, and the opposing evidence is strong and clear, the court ought to interfere, and relieve the injured party.
In the case before us, the defendant, who is in possession of the verdict, produced a will, purporting to be executed with all the legal formalities. In support of this will, the three subscribing witnesses, all swore, that the testator heard it read, assented to its correctness, and executed it, as, and for, his last will and testament; and that when he so executed it, he was of sound and disposing mind and memory, competent to perform the act; and then gave their reasons for their belief. Now, two of these witnesses were well known, of unblemished charac *781 ter, and unimpeachable veracity ; and the third, though poor and wandering, and a stranger, I saw no reason to disbelieve. Other witnesses united with these, as to his capacity, and detailed facts to corroborate their opinion.
If this evidence had remained uncontradicted, neither the court, the jury, the parties, nor the public, would have hesitated, as to the result. If the jury believed it, I think their verdict was right. And this, without admitting that they overlooked, or evaded the law, which determines the capacity necessary to make a will. The law on that point, as the law always is, was the first and highest evidence before them; which they were bound to regard, and to which their character ensured attention. It is certainly very true, that the plaintiff produced much evidence, calling in question the testamentary capacity, but it was in hostility with that of the defendant, and the jury, not the court, held the balance.
Intending, in this, as in every case, to avoid encroaching upon the rights of the jury, I carefully abstain from expressing any opinion of the merits of this cause, but governed by the rule which I have mentioned, and which I esteem correct, I do not hesitate in the judgment which I think it my duty to pronounce. *1 discover no error in the opinions expressed by the court. The jury possessed much more than ordinary intelligence. The cause was fairly and fully, before them. The evidence was strongly contradictory. There was enough, if believed, to support the verdict; and I perceive, therefore, no requirement of legal principles, nor of justice, demanding a new trial.
I have only to add, that I have seldom investigated a cause with greater anxiety to arrive at the truth ; and if in the result which 1 have reached, I have fallen into error, it has not been for the want of ample aid, to assist my inquiries. The rights of the parties, upon the argument, receive an elucidation, which would not have been surpassed at any bar.
I think the rule to shew cause, ought to be discharged.
Rule discharged and judgment for defendant.

 Hutchinson vs. Coleman, 5 Hal. 74. Lloyd vs. Newell, 3 Hal. 296. Powers vs. Butler, 3 Gr. Ch. 465. Corlies vs. Little, 2 Gr. 373. Bell ads. Shields, 4 Har. 93. Boylan ads. Meeker, 4 Dutch. 330, 476. Chamberlain vs. Letson, ante 452. Van Blarcom vs. Kip, 2 Dutch. 351. Ryerson vs. Morris Canal, 4 Dutch. 97. Knickerbocker Ice Co. vs. Anderson, 2 Vr. 333. Fuller vs. Carr, 4 Vr. 157. Den vs. Ayres, 1 Gr. 153.

 Donnelly vs. State, 2 Dutch. 506, 602. Miller vs. Miller, 1 Gr. Ch. 141. Smith vs. Drake, 8 C. E. Gr. 302. See State vs. Bailly, Pen. *416. Vaughn vs. Perrine, Pen. *728. Fries vs. Brugler, 7 Hal. 79. State vs. Fox, 1 Dutch. 566. Van Houten vs. Van Houten, in Chancery, Hal. Dig. 924, § 61.

 Declarations of testator inadmissible, Yard vs. Carman, Pen. *936 Adamson vs. Ayres, 1 Hal. Ch. 349. Account of exrs. of Samuel Haines, 4 Hal. Ch. 506. Vernon vs. Marsh, 2 Gr. Ch. 502. Smock vs. Smock, 3 Stock. 157. Massaker vs. Massaker, 2 Beas. 264. Leigh vs. Savidge, 1 McC. 125. Sayre vs. Sayre, 2 Gr. 495. Boylan ads. Meeker, 4 Dutch. 274, 291. Lynch vs. Clements, 9 C. E. Gr. 437. But see Day vs. Day, 2 Gr. Ch. 549. Speer vs. Speer, 1 McC. 240. Boylan vs. Meeker, 2 McC. 310. Aliter where a latent ambiguity exists, Den vs. Cubberly, 7 Hal. 309. Evans vs. Hooper, 2 Gr. Ch. 204. Holton ads. While, 3 Zab. 330. Leigh vs. Savidge, 1 McC. 125. Nevius vs. Martin, 1 Vr. 465. Halsted vs. Meeker, 3 C. E. Gr. 136. Jackson vs. Perrine, 6 Vr. 144. Graydon vs. Graydon, 8 C. E. Gr. 230.

 Den vs. Johnson, ante 458. Den, Stevens vs. Vancleve, 4 Wash. C. C. 262. Den vs. Clark, 5 Hal. 221. Den vs. Ayres, 1 Gr. 153. Sloan vs. Maxwell, 2 Gr. Ch. 563. Andress vs. Weller, 2 Gr. Ch. 604. Goble vs. Grant, 2 Gr. Ch. 629. Whitenack vs. Stryker, 1 Gr. Ch. 8. Lowe vs. Williamson, 1 Gr. Ch. 82. Doughty vs. Doughty, 3 Hal. Ch. 643. Vanauken’s Case, 2 Stock. 187. Stackhouse vs. Horton, 2 McC. 202. Turner vs. Cheesman, 2 McC. 243. Den, Trumbull vs. Gibbons, 2 Zab. 117. Boylan ads. Meeker, 4 Dutch. 274. Moore vs. Blauvelt, 2 McC. 367, 384.

 Den, Brown vs. Little, Coxe 152.